## UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## DURHAM DIVISION

| | |
|---|---|
| IN RE:<br><br>VILCOM INTERACTIVE MEDIA, LLC,<br><br><br>DEBTOR. | CASE NO. 14 - 81181<br><br>CHAPTER 11 |

| |
|---|
| **Motion To (A) Approve Sale Of Substantially All Assets Of VilCom Interactive Media, LLC, (B) Transfer Any And All Claims, Liens, Encumbrances And Interests To Proceeds Of Sale, And (C) Authorize Assumption And Assignment At Closing Of Certain Executory Leases And Contracts To VIM Acquisition, LLC** |

NOW COMES VilCom Interactive Media, LLC, pursuant to §§ 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 6004 and 6006, and hereby moves the Court as follows:

1.        On October 24, 2014 (the "Petition Date"), University Directories, LLC ("UD"), Print Shop Management, LLC ("Print Shop"), VilCom, LLC ("VilCom"), VilCom Interactive Media, LLC ("VIM"), VilCom Properties, LLC ("VP") and VilCom Real Estate Development (VRD), LLC ("VRD," and collectively, the "Debtors") filed voluntary petitions seeking relief under Chapter 11 of the Bankruptcy Code and Orders for relief were entered in each case.

2.        This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§157 and 1334, and this matter is a core proceeding under 28 U.S.C. §157(b)(2).  Venue is proper pursuant to 28 U.S.C. §§1408 and 1409.

**Background**

3.        Subsequent to the Petition Date, the cases were consolidated for purposes of administration only. All of the Debtors except for VIM have now been converted to Chapter 7, trustees have been appointed, and the cases are no longer jointly administered.

4.        No official committee of unsecured creditors has been appointed in the VIM case, and the Court has appointed Everett B. Saslow, Jr., (the "Trustee") as Chapter 11 Trustee for VIM.

5.        VIM owns and operates WCHL, W250BP, and Chapelboro.com which is an on-line news and marketing service.  WCHL began operations in 1953, was acquired by VIM in 1993, and is

based in Chapel Hill, North Carolina.  Customers consist primarily of individuals and companies who seek to advertise in the Chapel Hill market.

**Disputed Liens**

6.      VIM acknowledges that it executed certain loan documents in favor of Harrington Bank, including but not limited to a guaranty of certain loans made by Harrington Bank to University Directories, LLC (the "UD Loans") and a security agreement in which VIM pledged substantially all its assets to secure payment of the UD Loans. The UD Loans were subsequently assigned to UDX, LLC ("UDX") and are disputed by the Debtors. VIM contends that, among other things, its guaranty and its security agreement made with respect to the UD Loans are subject to avoidance pursuant to Section 548 of the Bankruptcy Code, and thus the UDX claims are subject to bona fide dispute.

7.      VIM acknowledges that it executed certain loan documents in favor of VilCom, LLC, providing a blanket lien on all VIM's assets which was subordinated to the lien now held by UDX. VIM contends that the security interest in favor of VilCom is subject to avoidance, as the UCC-1 Financing Statement had lapsed and a new Financing Statement was filed within 90 days prior to the Petition Date, and thus the VilCom claims are subject to bona fide dispute.

**Marketing Efforts**

8.      Joseph B. McCoy, III and Media Services Group, Inc. (the "Broker") was employed by VIM to sell the VIM Assets pursuant to a Marketing Agreement that had been executed on October 25, 2013. The Marketing Agreement provides for a 10% commission on sales less than $1,000,000 with a minimum of $50,000.

9.      Holt Media Group was retained as an appraiser to value the radio stations and concluded that the value as of May 1, 2015 was $500,000.

10.      VIM Acquisition, LLC (an entity created by Edward Holmes) has submitted to the Trustee an offer to purchase substantially all the assets of VIM as set forth in the Asset Purchase Agreement described below.

**Proposed Sale**

11.      VIM proposes to sell substantially all its tangible and intangible assets as a going concern to VIM Acquisition, LLC (the "Purchaser") subject to Court approval. The terms of the sale are set forth in the Asset Purchase Agreement attached hereto as **Exhibit A** (the "Purchase Agreement") and summarized as follows:

a.      The assets to be sold (the "Sale Assets") include WCHL (AM), W250BP (FM), Chapelboro.com (website), accounts receivable, inventory, supplies, equipment and all other tangible or intangible assets, except as otherwise specifically excluded.  The Sale Assets also include the Life Insurance Policy #82 263 807 dated October 27, 2009 with John Hancock, as Carrier, payable upon the death of James A. Heavner, as insured, in the amount of $1,000,000.00, with VIM as the Owner and Beneficiary.

b.      Excluded from the sale (the "Excluded Assets") are corporate records, causes of action against UDX, LLC, et al, as set forth in the Amended Complaint previously filed in the U.S. Bankruptcy Court for the Middle District of North Carolina, AP No. 14-09062, and other causes of action which may be brought pursuant to Chapter 5 of the Bankruptcy Code.

c.      The purchase price is approximately $435,000, payable as follows:

      i.   $400,000 in cash, due at closing (the "Cash Purchase Price").

      ii.  Up to $50,000 (but estimated at approximately $35,000) by the assumption of certain prepetition and/or post-petition trade payables.

d.      Upon execution of the Agreement, Purchaser has agreed to deposit with the Seller's Bankruptcy Trustee the amount of One Hundred Thousand Dollars ($100,000.00)(the "Escrow Funds") to be held in escrow until Closing occurs, but subject to the return of the Escrow Funds upon any termination of the Agreement other than by reason of Purchaser's breach or default.

e.      The Purchaser has agreed to provide Post-Petition Financing to Seller upon the terms set forth in the "Motion By VilCom Interactive Media, LLC To Authorize Post-Petition Financing" filed June 29, 2015, modified as follows:

      i.   Purchaser shall lend such amounts, not to exceed $70,000 in the aggregate, as shall be reasonably necessary to fund operations until, and pay all of Seller's obligations arising in the ordinary course and accrued as of, the Closing.

      ii.  At Closing, the Cash Purchase Price amount shall be credited in the lesser of Thirty-Five Thousand Dollars ($35,000.00) or the total outstanding Post-Petition Financing and Purchaser agrees that it will not seek to recover from Seller any remaining balance of the Post-Petition Financing then outstanding.

      iii. In the event Closing does not occur, the full amount of the Post-Petition Financing shall be due and payable in accordance with the terms thereof.

12.     The Purchase Agreement is expressly conditional upon the following:

a.      Entry of an Order by the Bankruptcy Court (i) approving the sale and transferring all claims, liens and interests to proceeds, and (ii) authorizing the assumption and assignment of certain executory leases and contracts.

b.      Approval by the Federal Communications Commission (the "FCC") for the assignment of the FCC Licenses.

c.      Assumption and Assignment at closing of the Assigned Contracts described below.

13.     With respect to obtaining FCC approval for the transfer of the license, the parties have agreed that Brooks, Pierce, McLendon, Humphrey & Leonard LLP ("Brooks Pierce"), VIM's Special FCC Counsel, (i) will assist Seller in drafting the provisions in the Purchase Agreement regarding FCC Consent, at Seller's sole cost and expense, and (ii) subject to first obtaining Bankruptcy Court approval of the Purchase Agreement, will then assist Seller and Purchaser in obtaining the FCC Consent, advising on FCC rules and regulations, and preparing any ancillary documents related to the FCC Consent and the transfer of the FCC Licenses contemplated herein, and the cost and expense of such services shall be shared equally by Seller and Purchaser.  In the event the proposed sale to Purchaser is not approved by the Bankruptcy Court, or if the sale is approved but fails to close for any reason, Brooks Pierce may continue to represent Seller as Special FCC Counsel and shall cease further representation of Purchaser.

14.     The parties may terminate the Purchase Agreement if, among other reasons, (i) the required Bankruptcy Court Orders are not entered, (ii) the FCC Consent is not obtained, or (iii) Closing shall not have occurred by October 15, 2015.

**Executory Leases and Contracts**

15.     In conjunction with the proposed sale and as a condition to Closing, certain executory leases or contracts (the "Assigned Contracts") are to be assumed by VIM and assigned to the Purchaser as summarized below:

a.      License Agreement between SpectraSite Communications, LLC, as licensor, and Seller, as licensee, dated _____, 2012; Assignment of License Agreement between Seller, as assignor, and VilCom Properties, LLC, as assignee, effective as of August 1, 2012, and Sub-License Agreement between Seller, as sub-licensee, and VilCom Properties, LLC, as sub-

licensor, dated August 1, 2012, regarding the FM tower and its facilities located on Jones Ferry Road, Chapel Hill, NC (the "Jones Ferry Location").

b.      Lease Agreement between Jeff Beck, LLC (successor in interest to Bet Pou McClamroch), as landlord, and Village Broadcasting Company, Incorporated, as lessee, dated May 1, 1996, as modified by Assignment, Assumption and Consent Agreement, between Village Broadcasting Company, Inc., as assignor, WCHL, Inc., as assignee, and Bet Pou McClamroch, as landlord, dated October 16, 1997, Addendum to Lease between Bet Pou McClamroch and WCHL-WDNC, Inc. dated August 30, 2002, and Assignment, Assumption and Consent Agreement between WCHL-WDNC, Inc., as assignor, Seller, as assignee, and  Bet Pou McClamroch, as landlord, dated August 15, 2004.

c.      Lease Agreement between Seller, as tenant, and Vilcom McClamroch Property, LLC (successor in interest to VilCom Properties, LLC), as landlord, dated August 1, 2000, as modified by Amendment between Seller, as tenant, and VilCom Properties, LLC dated October 6, 2006, Lease Addendum Agreement between Seller, as tenant, and VilCom Properties, LLC, as landlord, dated September 1, 2009, and Third Lease Amendment between Seller, as tenant, and VilCom Properties, LLC, as landlord, dated December 31, 2011, regarding office space located at 88 Vilcom Circle.

d.      Tar Heel Sports Network Agreement between Learfield Communications, Inc. and Seller, as broadcaster, dated September 17, 2009.

e.      AP Online Video Network Agreement between The Associated Press and Seller dated December 1, 2008.

f.      CBS News Affiliation Agreement dated May 11, 2015, between Westwood One, Inc. and VIM.

g.      Service Agreement between VIM and Time Warner Cable, Inc., dated February 24, 2012, for feed to AM transmitter site.

h.      Service Agreement between VIM and Time Warner Cable, Inc., dated March 7, 2012, for internet to office/studio.

i.      Software License and Service Agreement between VIM and Marketron Broadcast Solutions, LLC, dated January 1, 2013.

j.      Agreement between WCHL-AM and Broadcast Music, Inc.

k.      2004 Radio Station License Agreement between VIM and American Society of Composers, Authors and Publishers.

16.     Although VIM is informed and believes that all the Assigned Contracts listed above are current and free of default, any payment necessary to assume and assign such lease or contract to the Purchaser shall be paid by VIM as to payments due for periods prior to Closing, and the Purchaser shall be responsible for payments due for periods on or after the Closing. At the hearing to consider approval of the proposed sale, the Purchaser shall provide adequate assurance of future performance with respect to all leases or contracts to be assumed and assigned.

17.     At the election of Purchaser, subject to obtaining the consent of the other party to the respective contracts (where applicable), the following executory contracts (the "Discretionary Contracts") may also be assigned to the Purchaser at Closing, but assignment of any or all of the Discretionary Contracts is not a condition to Closing:

a.      Advertising contracts.

b.      Agreement between WCHL and Dial Global dated January 28, 2010, as may be amended, regarding broadcasting of The Best of Bill Press.

c.      Agreement between WCHL and Dial Global dated January 28, 2010, as may be amended, regarding broadcasting of The Best of Thom Hartmann.

d.      Addendum for WCHL-AM 1360 Ed Schultz Contract dated January 25, 2010 between Seller and Dial Global.

e.      Addendum for WCHL-AM 1360 Stephanie Miller Show Contract dated January 25, 2010 between Seller and Dial Global.

f.      Addendum for WCHL-AM 1360 Ed Schultz, Stephanie Miller, Best of Stephanie Miller and Best of Thom Hartmann Show Contracts dated March 25, 2010 between Seller and Dial Global.

g.      Agreement between Seller and SESAC dated _____.

**Basis For Approval**

18.     Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."

19.     Section 363(f) of the Bankruptcy Code provides authority for this Court to provide approval of the sale free and clear of all liens, claims, interests and encumbrances transferred to proceeds of sale.

20.     VIM is dependent upon the use of its cash collateral and post-petition financing. In the most recent cash collateral and post-petition financing orders, VIM was authorized to borrow certain amounts from VIM Acquisition, LLC pending a further hearing on July 21, 2015, and VIM may need additional financing to continue operations thereafter.

21.     The claims filed by creditors in the VIM case are summarized as follows:

| | | |
|---|---|---|
| a. | $3,107.48 | Priority Unsecured Claim, Orange County |
| b. | $34,018.98 | Unsecured Claims held by non-insiders[1] |
| c. | $2,140,717.00 | Secured Claim, UDX (disputed as to claim and lien) |
| d. | $1,438,893.00 | Secured Claim, VilCom (disputed as to lien) |
| e. | $279,138.97 | Unsecured Claims held by insiders[2] |

22.     VIM believes that the value of its assets will be maximized through the contemplated sale, and that the purchase price is fair, reasonable, and in the best interest of the estate. A substantial portion of the purchase price is attributable to the going concern value of the business, and a forced liquidation of the assets would likely provide far less. Further, to the extent existing contracts are assigned to the Purchaser, the estate will be protected against potential contract rejection claims.

        WHEREFORE, VIM prays the Court for entry of an Order:

1.      Finding that the Purchaser is a bona fide purchaser for value and a "good faith purchaser" within the meaning of Section 363(m) of the Bankruptcy Code, and that none of the grounds set forth in Section 363(n) exist with respect to the sale.

2.      Finding that the Purchase Price is fair and reasonable, for full, fair and adequate consideration and in the best interest of the estate, and authorizing the sale, transfer and conveyance of the Sale Assets to the Purchaser.

3.      Finding that the commission due or owing to the Broker shall be paid by VIM at Closing from the Cash Purchase Price, and that Purchaser has no liability or obligation for payment thereof.

---

[1] One creditor of UD mistakenly filed its proof of claim in the VIM case. The remaining creditors on this list are to be assumed by the Purchaser.
[2] The equity interests are held by Mr. Holmes, Mr. Woodruff and Mr. Heavner.

4.      Finding that one or more of the grounds for a sale free and clear pursuant to Section 363(f) of the Bankruptcy Code has been met as to each claim, lien, encumbrance or interest in any or all of the Sale Assets, and transferring any and all claims, liens, encumbrances and interests in or upon the Sale Assets to the proceeds of the sale.

5.      Finding that appropriate notice has been provided to all non-debtor parties to the Assigned Contracts and other parties in interest; determining the payment, if any, necessary to assume each executory lease or contract; finding that with respect to each lease or contract to be assigned, that the Purchaser has provided adequate assurance of future performance; and authorizing the Debtor to assume the Assigned Contracts and to assign the Assigned Contracts to the Purchaser at Closing.

6.      Authorizing the Debtor to assume and assign the Discretionary Contracts to the Purchaser at Closing, subject to obtaining the consent of the non-debtor parties to the Discretionary Contracts where applicable.

7.      Providing that the Order in all respects shall be effective immediately, pursuant to Rules 6004 and 6006, and providing such other relief as the Debtor shall reasonably request.

Respectfully submitted on behalf of the Debtor, this the 10th day of July, 2015.

/s/ John A. Northen

**Special Counsel for the Trustee:**
Northen Blue, LLP
John A. Northen, NCSB #6789
jan@nbfirm.com
Vicki L. Parrott, NCSB #25449
vlp@nbfirm.com
John Paul H. Cournoyer, NCSB #42224
jpc@nbfirm.com
Post Office Box 2208
Chapel Hill, NC 27515-2208
Telephone:  919-968-4441
Fax: 919-942-6603

## ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of July 10, 2015, by and among VilCom Interactive Media, LLC, a North Carolina limited liability company ("Seller"), and VIM Acquisition, LLC, a North Carolina limited liability company ("Purchaser"). Seller and Purchaser are sometimes herein referred to collectively as the "Parties" and individually as a "Party."

WHEREAS, Seller desires to sell to Purchaser, and Purchaser desires to purchase and acquire from Seller, substantially all of Seller's assets used in connection with the business or operation of WCHL and Chapelboro "free and clear" of all liens, security interests, claims, encumbrances and other interests pursuant to a Sale Order under Section 363 of the Bankruptcy Code in Seller's Chapter 11 case (the "Chapter 11 Case") now pending in the United States Bankruptcy Court for the Middle District of North Carolina (the "Bankruptcy Court") and upon such other terms and conditions as are set forth herein.

NOW, THEREFORE, in consideration of the foregoing recitals and the respective covenants, agreements, representations and warranties contained herein and for other good and valuable consideration the receipt and adequacy of which are hereby acknowledged, the Parties, intending to be legally bound, agree as follows:

ARTICLE 1
PURCHASE AND SALE OF ASSETS

1.1    Purchased Assets. Subject to the terms and conditions of this Agreement, at the Closing Seller shall sell, transfer, assign, convey and deliver to Purchaser, and Purchaser shall purchase, acquire and accept from Seller, free and clear of any and all Liens, all of the Seller's legal and beneficial right, title and interest in, to and under, as of the Closing Date, any and all of the following assets used in connection with the operation of AM radio station WCHL(AM), Chapel Hill, NC, and FM translator station W250BP, Chapel Hill, NC (collectively, the "Station") and Chapelboro, wherever located and whether or not carried or reflected on the books and records of the Seller, whether now existing or hereinafter acquired: (i) accounts receivable and prepaid expenses; (ii) other personal property, including vehicles, equipment, furniture, leasehold improvement, business records, software, and customer lists; (iii) contract and permit rights; (iv) goodwill; (v) all telephone and facsimile numbers, websites, e-mail addresses, apps, internet domain names, Facebook, Twitter, Instagram, LinkedIn and other social media accounts used in the business; (vi) other business assets, including those items listed on Schedule 1.1 attached hereto (the "Assets"); (vii) the Intellectual Property used or held for use by the Seller exclusively in the business or operation of the Station and Chapelboro, together with the goodwill associated with and symbolized by each of the foregoing and those items listed on Schedule 2.5 attached hereto; (viii) all assignable registrations, applications, renewals, issuances, renewals, extensions, restorations and reversions for, in respect of or relating to the Assets (the "Intellectual Property Assets"); and (ix) the FCC Licenses, together with the goodwill associated with and symbolized by each of the foregoing (collectively, the Assets and the Intellectual Property Assets are the "Purchased Assets").

Notwithstanding the foregoing, the Purchased Assets shall not include corporate records, causes of action against UDX, LLC, et al, as set forth in the Amended Complaint previously filed in the U.S. Bankruptcy Court for the Middle District of North Carolina, AP No. 14-09062, and other causes of action which may be brought pursuant to Chapter 5 of the Bankruptcy Code.

1.2     Assumption of Liabilities.  Purchaser shall not assume any Liability of the Seller, or any predecessor or any Affiliate of the Seller, nor any Liability associated with or relating to the Purchased Assets except for (i) certain prepetition and/or post-petition trade payables in amounts not to exceed $50,000 as listed on Schedule 1.2 attached, and (ii) any Contracts that Purchaser and the Seller mutually agree in writing will be assigned and assumed pursuant to Section 4.6 (collectively, the "Assumed Liabilities").  The Seller shall be solely responsible for all Liabilities arising from the business and operation of the Purchased Assets prior to Closing, and Purchaser shall be solely responsible for all Liabilities arising from the business and operation of the Purchased Assets after Closing.

1.3     Consideration.  The aggregate consideration (the "Purchase Price") payable by Purchaser in consideration for the sale, transfer, assignment, conveyance and delivery by the Seller to Purchaser of the Purchased Assets shall be the amount of Four Hundred Thousand Dollars ($400,000) plus the assumption of certain payables not to exceed Fifty Thousand Dollars ($50,000) as provided for in Section 1.2 above, and shall consist of the following:

(i)     Four Hundred Thousand Dollars ($400,000) (the "Cash Purchase Price"), payable in cash or readily available funds at Closing, and

(ii)     Assumption by the Purchaser of the obligations of Seller for certain prepetition and/or post-petition trade payables in an aggregate amount not to exceed Fifty Thousand Dollars ($50,000), as more specifically described on Schedule 1.2.

(iii)     Purchaser agrees to provide Debtor in Possession Financing (the "DIP Financing") to Seller upon the terms set forth in the "Motion By VilCom Interactive Media, LLC To Authorize Post-Petition Financing" filed June 29, 2015 and the Post-Petition Financing Agreement dated July 7, 2015, between Purchaser and Seller (the "Financing Agreement"), as follows:

a.  Prior to the approval of the Sales Order, Purchaser has agreed to fund DIP Financing in an amount not to exceed Thirty-Five Thousand and 00/100 Dollars ($35,000.00) pursuant to the terms of the Financing Agreement; as of the date hereof, the sum of Twenty-Five Thousand and 00/100 Dollars ($25,000.00) has been funded.  After the approval of the Sale Order, and so long as this Agreement is still in effect, Purchaser agrees to provide up to an additional Thirty-Five Thousand and 00/100 Dollars ($35,000.00) of DIP Financing to Seller, so long as such DIP Financing can be provided on the same terms and conditions provided for in the Financing Agreement.

b.  At Closing, the Cash Purchase Price amount shall be credited in the lesser amount of Thirty-Five Thousand Dollars ($35,000.00) or the total outstanding

2

DIP Financing and Purchaser agrees that it will not seek to recover from Seller any remaining balance of the DIP Financing then outstanding.

c.    In the event this Agreement is terminated, the full amount of the DIP Financing shall be due and payable in accordance with the terms of the Financing Agreement.

Upon execution of this Agreement, Purchaser agrees to deposit with the Seller's Bankruptcy Trustee the amount of One Hundred Thousand and 00/100 Dollars ($100,000.00)(the "Escrow Funds") to be held in escrow until Closing occurs; at Closing the Escrow Funds shall be applied to the Cash Purchase Price. The Escrow Funds shall be held in escrow and may not be used for the operation of the Seller, the Station or Chapelboro.  The Escrow Funds shall immediately be returned to Purchaser upon written notice from Purchaser of any termination of this Agreement, other than a termination by Seller due to Purchaser's uncured breach of this Agreement pursuant to Section 6.1(d), subject to the notice and cure rights contained therein.  Seller's Bankruptcy Trustee signs below to acknowledge and agree to the provisions of this Section 1.3.

    1.4    <u>Closing</u>.  The consummation of the Transactions (the "<u>Closing</u>") shall take place at 10:00am EDT on the date ten days after the FCC Consent has become a Final Order as required by <u>Section 4.10</u>, all in a form satisfactory to Purchaser, and subject to the satisfaction or waiver of the other conditions set forth in <u>Article 5</u> (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions), unless another time or date, or both, are agreed to in writing by the Parties (the date on which the Closing occurs is referred to herein as the "<u>Closing Date</u>").  At the election of the Parties, the Closing may occur via the electronic exchange of signatures and documents.

    1.5    <u>Closing Deliverables</u>.  At the Closing and subject to the terms and conditions of this Agreement, the Seller and Purchaser shall deliver the following (as applicable):

        (a)    a Bill of Sale in the form attached hereto as <u>Exhibit 1.5(a)</u> (the "<u>Bill of Sale</u>") duly executed by Seller;

        (b)    duly executed assignments, in form and substance satisfactory to Purchaser and sufficient to transfer ownership of the applicable Purchased Assets;

        (c)    if any Contracts are being assigned by the Seller to Purchaser pursuant to <u>Section 4.6</u> or otherwise, then an assignment and assumption of such Contracts, duly executed by Seller and Purchaser;

        (d)    an assignment of the FCC Licenses; and

        (e)    Seller shall execute and deliver to Purchaser (and to such other parties as necessary) all documents reasonably requested by Purchaser to transfer to Purchaser all telephone and facsimile numbers, websites, e-mail addresses, apps, internet domain names, Facebook, Twitter, Instagram, LinkedIn and other social media accounts used in the business.

3

ARTICLE 2
REPRESENTATIONS AND WARRANTIES OF THE SELLER

The Seller hereby represents and warrants to Purchaser as follows:

2.1      Organization and Good Standing.

(a)      Seller is a limited liability company, as the case may be, duly organized, validly existing and in good standing under the Laws of its state of organization, and has all necessary limited liability company power and authority to enter into this Agreement and each of the other Transaction Documents, to carry out its obligations hereunder and thereunder, and to consummate the Transactions.

(b)      Seller has all necessary power and authority to own, operate and transfer the Purchased Assets.

2.2      Authorization of Agreement.  Subject to approval by the Bankruptcy Court, the execution and delivery of this Agreement and each of the other Transaction Documents to be executed by the Seller, the performance by the Seller of its respective obligations under this Agreement and each Transaction Document, and the consummation by the Seller of the Transactions have been duly authorized by Seller and all requisite limited liability company action on the part of Seller, and no other action or proceeding on the part of Seller is necessary to authorize the execution and delivery of this Agreement and each of the other Transaction Documents by the Seller, or the consummation of the Transactions.  Subject to approval by the Bankruptcy Court, this Agreement has been, and upon their execution, the other Transaction Documents shall have been, duly executed and delivered by the Seller, and (assuming due authorization, execution and delivery by Purchaser), this Agreement constitutes, and, upon their execution, the other Transaction Documents shall constitute, legal, valid and binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms, except to the extent such enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws now or hereafter in effect affecting the enforcement of creditors' rights generally, general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

2.3      Conflicts; Consents of Third Parties.  Subject to approval by the Bankruptcy Court and the FCC Consent, none of the execution and delivery by the Seller of this Agreement or any of the other Transaction Documents, the consummation of the Transactions, or compliance by the Seller with any of the provisions hereof or thereof will result in the creation of any Lien upon the Purchased Assets, or materially conflict with, or result in any material violation of or material default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, acceleration or cancellation under any provision of (i) the organizational or governance documents of Seller; (ii) any order of any Governmental Body applicable to Seller or any of the properties or assets of the Seller as of the date hereof; (iii) any Contract or Permit to which Seller is a party or by which any of the properties or assets of Seller are bound; or (iv) any applicable Law.  Other than approval by the Bankruptcy Court and the FCC Consent, no material

4

consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of the Seller in connection with the execution and delivery of this Agreement or the other Transaction Documents, the compliance by the Seller  with any of the provisions hereof or thereof, the consummation of the Transactions or the taking by the Seller of any other action contemplated pursuant to the Transaction Documents.

2.4　　　　Title to Purchased Assets.  The Seller has good and transferable title to the Purchased Assets free and clear of all Liens (after entry of the Sale Order), and, at the Closing, Purchaser will be vested with good and transferable title to such Purchased Assets free and clear of all Liens (other than any Liens arising from Purchaser's ownership of such Purchased Assets).

2.5　　　　Intellectual Property. Schedule 2.5 sets forth a true and complete list of all material Intellectual Property Assets, including the owner thereof.  Seller is the owner of the Intellectual Property Assets, free and clear of all Liens (after entry of the Sale Order), and has the right to use, without payment to any other Person, such Intellectual Property, as and where the Seller has used it.  Other than the Intellectual Property set forth on Schedule 2.5, the Seller does not own or otherwise have any rights to, either through direct ownership, license or otherwise, any material Intellectual Property that is exclusively used or held for use in, or that exclusively relates to, the business or operation of the Station.  To the knowledge of the Seller, there are no Actions, decided, pending or threatened in writing, concerning the Purchased Assets or concerning any claim that the Seller's use of the Purchased Assets has infringed, diluted, misappropriated, or otherwise violated in any material respect any Intellectual Property rights of any other Person.  The Seller has not received any written notice or claim challenging the validity, enforceability, registration or use of any Purchased Assets.

2.6　　　　Governmental Licenses.  Schedule 2.6 includes true and complete copies of all material licenses owned or used by Seller ("Licenses"), including FCC Licenses. All FCC Licenses have been validly issued, and Seller is the authorized legal holder thereof. The FCC Licenses included in Schedule 2.6 comprise all of the material licenses, Permits, and other authorizations required from any governmental or regulatory authority for the lawful conduct of the business and operations of the Station in the manner and to the extent they are now conducted. Except as set forth on Schedule 2.6, the FCC Licenses are in full force and effect, and the conduct of the business and operations of the Station is in compliance therewith except for such noncompliance that could not reasonably be expected to have a material adverse effect.

(a)　　　None of the FCC Licenses is the subject of any pending or, to the knowledge of Seller, threatened proceeding for the revocation, cancellation, adverse modification, suspension, or non-renewal thereof.

(b)　　　To the knowledge of Seller, Seller's operation of the Station is in compliance in all material respects with the FCC's regulations and policies regarding maximum permitted exposure limits for power density and magnetic electric field strength and American National Standards Institute Standards C95.1- 1992 to the extent required under applicable rules and regulations.

2.7 <u>Claims and Legal Actions.</u>  Except for any FCC rulemaking proceedings generally affecting the broadcasting industry, or as listed on <u>Schedule 2.7</u> attached hereto, there is no material claim, legal action, counterclaim, suit, arbitration, governmental investigation or proceedings or other legal, administrative, or tax proceeding, nor any material order, decree or judgment pending or, to Seller's knowledge, threatened, against Seller with respect to its ownership or operation of the Station or otherwise relating to the Purchased Assets.

ARTICLE 3
REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to the Seller as follows:

3.1 <u>Organization and Good Standing.</u>  Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of its state of organization, and has all requisite power and authority to own, lease and operate its properties and to carry on its business as now conducted.

3.2 <u>Authorization of Agreement.</u>  Purchaser has all requisite power and authority to execute and deliver this Agreement, the other Transaction Documents and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the Transactions, and to consummate the Transactions.  The execution, delivery and performance by Purchaser of this Agreement and each other Transaction Document and the consummation by the Purchaser of the Transactions have been duly authorized by all necessary action on behalf of Purchaser and no other action or proceeding on the part of Purchaser is necessary to authorize the execution and delivery of this Agreement and each of the other Transaction Documents by Purchaser, or the consummation of the Transactions.  This Agreement has been, and each Transaction Document will be at or prior to the Closing, duly executed and delivered by Purchaser and (assuming the due authorization, execution and delivery by the other Parties hereto and thereto) this Agreement constitutes, and each Transaction Document when so executed and delivered will constitute, the legal, valid and binding obligations of Purchaser, enforceable against Purchaser in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

3.3 <u>Conflicts; Consents of Third Parties.</u>  Subject to the FCC Consent, none of the execution and delivery by Purchaser of this Agreement or the Transaction Documents, the consummation of the Transactions, or the compliance by Purchaser with any of the provisions hereof or thereof will materially conflict with, or result in any material violation of or material default (with or without notice or lapse of time, or both) under, or give rise to a right of payment, termination, modification, acceleration or cancellation under any provision of (i) the organizational or governance documents of Purchaser; (ii) any Contract or Permit to which Purchaser is a party or by which Purchaser or its properties or assets are bound; (iii) any order of any Governmental Body applicable to Purchaser or by which any of the properties or assets of Purchaser are bound; or (iv) any applicable Law. Other than approval by the Bankruptcy Court and the FCC Consent,

6

no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Person or Governmental Body is required on the part of Purchaser in connection with the execution and delivery of this Agreement or the Transaction Documents, the compliance by Purchaser with any of the provisions hereof or thereof, the consummation of the Transactions or the taking by Purchaser of any other action contemplated hereby or thereby.

3.4     Legal Proceedings.  There is no pending or, to the knowledge of Purchaser, threatened, Action by or against Purchaser that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, the Transactions.  To the knowledge of Purchaser, no event has occurred or circumstance exists that could reasonably be expected to give rise to or serve as a basis for the commencement of any such Action.

3.5     Authorization.  Purchaser has the requisite power and authority to consummate the Transactions contemplated by this Agreement and has taken all necessary action to authorize its performance of this Agreement.

ARTICLE 4
COVENANTS

4.1     Use of Trade Names or other Purchased Assets.  The Seller agrees that for the length of the full FCC license term for AM radio station WCHL(AM), Chapel Hill, NC, FCC Facility ID #70191, neither the Seller nor any Affiliate of the Seller shall use any of the Purchased Assets, or other assets confusingly similar thereto, in the Market.

4.2     Further Assurances.  Each of the Parties shall, and without further consideration, execute such additional instruments of assumption and provide such additional documents as may be requested by the other Parties hereto to ensure the proper assignment and assumption of the Assumed Liabilities by Purchaser and the proper transfer of the Purchased Assets to Purchaser and otherwise fully complete the Transactions and the other Transaction Documents.

4.3     Allocation of Purchase Price.  Seller and Purchaser shall allocate the Purchase Price among the Purchased Assets in accordance with Section 1060 of the Code and the Treasury Regulations promulgated thereunder.  Purchaser and the Seller each agree to provide the other promptly with any information required to complete IRS Form 8594.

4.4     Ancillary Agreements.  Prior to and following the Closing, upon the Seller's receipt of written notice by Purchaser, the Seller and Purchaser shall use their commercially reasonable efforts to obtain the following:

(a)     Approval by the Bankruptcy Court of this Agreement.

(b)     Consent by the FCC to this Agreement and to assignment from Seller to Purchaser of any FCC Licenses.

(c)     Issuance by Bankruptcy Court of the Sale Order pursuant to this Agreement.

7

(d)      Assignment to Purchaser of Seller's rights under the (i) License Agreement between SpectraSite Communications, LLC, as licensor, and Seller, as licensee, dated _____, 2012; Assignment of License Agreement between Seller, as assignor, and VilCom Properties, LLC, as assignee, effective as of August 1, 2012, and Sub-License Agreement between Seller, as sub-licensee, and VilCom Properties, LLC, as sub-licensor, dated August 1, 2012, regarding the FM tower and its facilities located on Jones Ferry Road, Chapel Hill, NC (the "Jones Ferry Location"); (ii) Lease Agreement between Jeff Beck, LLC (successor in interest to Bet Pou McClamroch), as landlord, and Village Broadcasting Company, Incorporated, as lessee, dated May 1, 1996, as modified by Assignment, Assumption and Consent Agreement, between Village Broadcasting Company, Inc., as assignor, WCHL, Inc., as assignee, and Bet Pou McClamroch, as landlord, dated October 16, 1997, Addendum to Lease between Bet Pou McClamroch and WCHL-WDNC, Inc. dated August 30, 2002, and Assignment, Assumption and Consent Agreement between WCHL-WDNC, Inc., as assignor, Seller, as assignee, and  Bet Pou McClamroch, as landlord, dated August 15, 2004; (iii) Lease Agreement between Seller, as tenant, and Vilcom McClamroch Property, LLC (successor in interest to VilCom Properties, LLC), as landlord, dated August 1, 2000, as modified by Amendment between Seller, as tenant, and VilCom Properties, LLC dated October 6, 2006, Lease Addendum Agreement between Seller, as tenant, and VilCom Properties, LLC, as landlord, dated September 1, 2009, and Third Lease Amendment between Seller, as tenant, and VilCom Properties, LLC, as landlord, dated December 31, 2011, regarding office space located at 88 Vilcom Circle; (iv) Tar Heel Sports Network Agreement between Learfield Communications, Inc. and Seller, as broadcaster, dated September 17, 2009; (v) AP Online Video Network Agreement between The Associated Press and Seller dated December 1, 2008; (vi) CBS News Affiliation Agreement dated May 11, 2015 between Westwood One, Inc., ("WWO") and Seller; (vii) Service Agreement between Seller and Time Warner Cable, Inc. dated February 24, 2012 for feed to AM transmitter site; (viii) Service Agreement between Seller and Time Warner Cable Inc. dated March 7, 2012 for internet to office/studio; (ix) Software License and Service Agreement between Seller and Marketron Broadcast Solutions, LLC dated January 1, 2013; (x) Agreement between WCHL-AM and Broadcast Music, Inc. ("BMI"); and (xi) 2004 Radio Station License Agreement between Seller and American Society of Composers, Authors and Publishers ("ASCAP").

4.5      Access to Employees.  To the fullest extent permitted by applicable Law, Seller shall cooperate with Purchaser in Purchaser's consideration of whether to offer employment to any employee of the Seller whose responsibilities solely relate to the operation of the Station ("Station Employees"), including by providing all information reasonably requested by Purchaser in respect of any Station Employee that may be disclosed by Purchaser under applicable Law; provided, however, that Purchaser shall not employ any Station Employee prior to the earlier of (i) the Closing; and (ii) the termination of this Agreement in accordance with its terms, and shall have no obligation to offer employment to any Station Employee.

4.6      Programming Contracts.  The Seller shall deliver to Purchaser and each of its designated representatives, copies of all Contracts of the Seller for programming and talent solely relating to the Station, including those Contracts listed in Schedule 4.18(b) – Part 1 and Part 2, to the extent not otherwise assigned pursuant to Section 4.4(d) ("Station Programming Contracts").  If Purchaser determines in its sole discretion, and notifies the Seller that Purchaser desires to assume any Station Programming Contract at the Closing (any such Station Programming Contract, a

"Designated Station Programming Contract"), then, subject to the receipt of any required consents needed for such assignment, the Seller shall assign and Purchaser shall assume such Designated Station Programming Contracts at Closing, and such Designated Station Programming Contracts shall be prorated as of Closing with the effect that the Seller is responsible for all obligations arising with respect to services rendered thereunder prior to Closing and Purchaser is responsible for all obligations arising with respect to services rendered thereunder after Closing. The Seller and Purchaser shall use commercially reasonable efforts to obtain any required consents to the assignment to Purchaser from the counterparties of such Designated Station Programming Contracts.

4.7     INTENTIONALLY DELETED.

4.8     INTENTIONALLY DELETED.

4.9     INTENTIONALLY DELETED.

4.10    FCC Consent.

(a)     The assignment of the FCC Licenses in connection with the purchase and sale of the Purchased Assets pursuant to this Agreement shall be subject to the prior consent and approval of the FCC.

(b)     Seller and Purchaser shall file an appropriate application requesting the FCC's written consent to the assignment of the FCC Licenses from Seller to Purchaser within five (5) business days from the date of the Sale Order (the "Application"). The Parties shall prosecute the Application with all reasonable diligence and otherwise use their commercially reasonable efforts to obtain a grant of the Application as expeditiously as practicable. Each Party will promptly provide the other Party with copies of any pleadings or other documents received by such Party (that are not also separately provided to or served upon such other party) with respect to the Application. Each Party agrees to comply with any condition imposed on it by the FCC Consent, except that no Party shall be required to comply with a condition if (1) the condition was imposed on it as the result of a circumstance the existence of which does not constitute a breach by the Party of any of its representations, warranties, or covenants under this Agreement, and (2) compliance with the condition would have a material adverse effect upon it. Purchaser and Seller shall cooperate with each other and otherwise employ commercially reasonable efforts to oppose any requests for reconsideration or judicial review of the FCC Consent. If the Closing shall not have occurred for any reason within the original effective period of the FCC Consent, and neither Party shall have terminated this Agreement, the Parties shall jointly request an extension of the effective period of the FCC Consent. No extension of the FCC Consent shall limit the exercise by any Party of its rights under Article 6.

(c)     Seller and Purchaser acknowledge that the law firm of Brooks, Pierce, McLendon, Humphrey & Leonard LLP ("Brooks Pierce") has provided services on behalf of the Seller, prepetition with respect to a number of matters and post-petition as Special FCC Counsel. In order to effectuate the Transactions contemplated herein, the Parties agree that Brooks Pierce (i) will assist Seller in drafting the provisions in the Agreement regarding FCC Consent, at Seller's sole cost and expense, and (ii) subject to first obtaining Bankruptcy Court approval of the Agreement, will then

9

assist Seller and Purchaser in obtaining the FCC Consent, advising on FCC rules and regulations, and preparing any ancillary documents related to the FCC Consent and the transfer of the FCC Licenses contemplated herein, and the cost and expense of such services shall be shared equally by Seller and Purchaser.  In the event the proposed sale to Purchaser is not approved by the Bankruptcy Court, or if the sale is approved but fails to close for any reason, Brooks Pierce may continue to represent Seller as Special FCC Counsel and shall cease further representation of Purchaser. After the date of Closing, and unless otherwise prohibited by the North Carolina Rules of Professional Conduct, Brooks Pierce may represent Purchaser in matters before the FCC, and Seller agrees it will not, solely as a result thereof, take any action to disqualify Brooks Pierce from such representation. Purchaser acknowledges that it has been advised to obtain independent legal counsel in connection with the foregoing, and has waived such right.  Seller and Purchaser specifically acknowledge and waive any conflict of interest that either may have in connection with the services provided by Brooks Pierce as relates to the limited services set forth above.

4.11     Control of the Station. Prior to Closing, Purchaser shall not, directly or indirectly, control, supervise, direct, or attempt to control, supervise, or direct, the operations of the Station; such operations, including complete control and supervision of all of the programs, and policies of the Station and employees of Seller, shall be the sole responsibility of Seller until the Closing.

4.12     Risk of Loss. The risk of any loss, damage, impairment, confiscation, or condemnation of any of the Purchased Assets from any cause, other than as a result of any action or omission of Purchaser or any of its agents, shall be borne by Seller at all times prior to the Closing.

4.13     Cooperation. Purchaser and Seller shall cooperate fully with each other and their respective counsel and accountants in connection with any actions required to be taken as part of their respective obligations under this Agreement, and Purchaser and Seller shall execute such other documents as may be necessary and desirable to the implementation and consummation of this Agreement, and otherwise use their commercially reasonable efforts to consummate the transaction contemplated hereby and to fulfill their obligations under this Agreement.

4.14     Access to Books and Records. Seller shall provide Purchaser reasonable access and the right to copy for a period of three years from the Closing Date any books and records relating to the assets that are not included in the Purchased Assets. Purchaser shall provide Seller reasonable access and the right to copy for a period of three years from the Closing Date any books and records relating to the Purchased Assets.

4.15     Purchaser Conduct. Purchaser shall take no action or fail to take any action that would (a) disqualify Purchaser from being the licensee of the Station under the Act and the rules, regulations and policies of the FCC or (b) prevent Purchaser from otherwise fulfilling its obligations to pay the entire Purchase Price on the Closing Date.

4.16     Cessation of Broadcast Operations. If, as a result of damage or destruction of the Station's broadcast facilities, the Station is not operating on the date that would otherwise be the Closing Date, the Closing shall be postponed for up to sixty (60) days, to permit the Station to resume normal broadcast operation. In such event, the Parties shall cooperate in good faith and use

10

reasonable efforts to agree upon a new Closing Date that is no later than 10 business days following the date the Station has commenced normal broadcast operations.

4.17       Use of Call Sign. After the Closing, Seller shall not use the domain name "chapelboro.com" or the call letters "WCHL" or any logo, variation or derivation thereof.

4.18       Access, Inspections and Confidentiality.

(a)       Provided that there be no significant disruption of the business operations, Seller shall permit Purchaser and Purchaser's directors, officers, employees, representatives, agents and advisors to have full access at all reasonable times to and to conduct reasonable inspections of any or all of the Purchased Assets and to any and all information, data and documentation pertaining to the conduct of the business or the ownership or operation of any of the Purchased Assets, and to cause Seller's directors, officers, employees, representatives, agents and advisors to furnish to Purchaser and Purchaser's officers, employees, representatives, agents and advisors such data and documentation relevant to the conduct of business or the ownership or operation any of the Purchased Assets as Purchaser may reasonably request.

(b)       Seller shall make available to Purchaser true and complete copies of all Assigned Contracts listed on Schedule 4.18(b), including any and all amendments and other modifications thereto. All information provided to the Purchaser pursuant to this Section 4.18 shall be considered confidential (the "Confidential Information") and the Purchaser agrees that the Confidential Information will be used solely for the purpose of consummating this Agreement and that all of the Confidential Information will be kept confidential; provided that any such information may be disclosed only to the limited group of the Purchaser's officers, directors, employees, agents, and outside advisors, who are actually engaged in and need to know the Confidential Information for the purpose of consummating this Agreement, who have been informed of the confidential nature of the Confidential Information, and who have been advised by and agree with Purchaser that such information is to be kept confidential and shall not be used for any purpose other than consummating this Agreement.

4.19       Preserving Value of Purchased Assets and Business. Pending Closing, Seller shall use its best efforts to maintain and operate the business in the ordinary course of business within the meaning of Section 363 of the Bankruptcy Code, shall not sell or otherwise dispose of assets or incur liabilities or obligations relating to the business or the Purchased Assets except in the ordinary course of business within the meaning of Section 363 of the Bankruptcy Code, shall keep in good operating condition, reasonable wear and tear excepted, all owned and leased machinery and equipment used in the business. Seller shall use its best efforts to (i) pay all post-petition administrative costs of doing business when due, (ii) pay employees and payroll taxes in accordance with the Bankruptcy Code and the Bankruptcy Court's orders, (iii) not terminate the employment of any person identified on Schedule 4.19 prior to Closing (y) without Purchaser's consent, which shall not be unreasonably withheld, or (z) without Court approval, and (iv) comply with all legal and regulatory requirements relating to the business.  Additionally, Seller agrees it will operate in accordance with the Financing Agreement and the Budget (as defined in the Financing Agreement).

4.20       Worker's Compensation. Seller shall be responsible for all costs associated with claims for workers' compensation and other occupational health or injury claims of employees of

Seller prior to the Closing Date and for any claim filed subsequent to the Closing Date made in connection with any injury, event or occurrence taking place, in whole or in part, prior to the Closing Date.  Seller will, should Purchaser so request, consent to the assignment to Purchaser of Seller's, where possible, risk experience.

      4.21        Chapter 11. Seller shall undertake the following:

      (a)      Seller shall file a motion for entry of an order by the Bankruptcy Court unconditionally approving this Agreement and the sale of the Purchased Assets to Purchaser in accordance with the terms and conditions hereof, said order (the "Sale Order") to be acceptable to Seller and to Purchaser and to provide, among other things, that: (i) Seller is authorized to assume and assign to Purchaser under Section 365 of the Bankruptcy Code all of the Assigned Contracts described on Schedule 4.18(b), (ii) Purchaser is a "good faith" Purchaser, within the meaning of Section 363(m) of the Bankruptcy Code, (iii) Purchaser is a bona fide purchaser for value, (iv) the Purchase Price is fair and reasonable, (v) appropriate notice has been provided to all non-debtor parties to the Assigned Contracts, all customers, creditors, and claimants of Seller, and all other persons or entities who hold or assert Liens in, to or against the Purchased Assets, (vi) the Purchased Assets are conveyed to Purchaser free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code, and (vii) the 14-day stay under Bankruptcy Rule 6004(h) does not apply.

      (b)      Seller shall use its best efforts to obtain a hearing (the "Sale Hearing") on the motion for the Sale Order and to obtain entry of the Sale Order at the earliest practicable date so that Closing may occur on or before September 30, 2015 subject to the FCC Consent.

      (c)      Seller's motions for entry of the Sale Order shall be in form and substance reasonably satisfactory to Purchaser.

      (d)      In the event that an appeal is taken, a stay pending appeal is requested or reconsideration is sought, from the Sale Order, Seller will immediately notify Purchaser thereof and provide Purchaser with a copy of all pleadings, orders, notices and other documents relating thereto.

      (e)      Seller shall give notice of all motions, notices and orders relating to this Agreement, including without limitation, the Sale Order, the notices of hearing, and the orders themselves, to all persons legally entitled to notice thereof under the Bankruptcy Code and Bankruptcy Rules.

ARTICLE 5
CONDITIONS PRECEDENT

      5.1        Conditions Precedent to Obligations of Purchaser and Seller.  The respective obligations of Seller and Purchaser to effect the Transactions are subject to the satisfaction of the following conditions at or prior to the Closing (unless expressly waived in writing by the Parties, in their discretion, at or prior to the Closing):

(a)     No injunction or restraining order shall have been issued by any court of competent jurisdiction and be in effect which restrains or prohibits any material transaction contemplated hereby or by any of the Transaction Documents.

(b)     There shall have not been commenced or threatened any proceeding or investigation by a Governmental Body of competent jurisdiction for the purpose of restraining, enjoining, delaying or otherwise materially restricting the consummation of the Transactions or materially limiting or materially restricting the conduct of any of the Parties or their Affiliates following consummation of the Transactions.

(c)     The Bankruptcy Court shall have entered the Sale Order approving the sale, transferring all liens or interests to proceeds, an authorizing the assumption and assignment of the Contracts to Purchaser, all in form and substance reasonably acceptable to Seller and to Purchaser.

(d)     The Sale Order is effective and has not been restrained, enjoined or stayed.

(e)     The FCC Consent shall have been granted, and the FCC Consent shall have become a Final Order. As used herein, the term "Final Order" shall mean that (1) the FCC Consent shall not have been reversed, stayed, enjoined, set aside, annulled or suspended; (2) no timely request for stay, petition for rehearing, appeal or certiorari with respect to the FCC Consent or sua sponte action of the FCC with comparable effect shall be pending, and (3) the time for filing any such request, petition, appeal, certiorari or for the taking of any such sua sponte action by the FCC shall have expired or otherwise terminated.  The parties may mutually agree to waive Final Order as a closing condition.

5.2     Conditions Precedent to Obligations of Purchaser. The obligations of Purchaser to effect the Transactions are subject to the satisfaction of the following conditions at or prior to the Closing (unless expressly waived in writing by Purchaser, in its discretion, at or prior to the Closing):

(a)     The Seller shall have performed and complied in all material respects with all covenants and agreements herein required by this Agreement to be performed or complied with prior to the Closing by the Seller; each of the representations and warranties of the Seller contained in this Agreement shall be true and correct in all material respects on the Closing Date as though made on the Closing Date (except to the extent that they expressly relate to an earlier date); and there shall have been delivered to Purchaser a certificate to such effect, dated as of the Closing Date, signed by a duly authorized officer of the Seller.

(b)     The Seller shall have delivered, or caused to be delivered, to Purchaser all of the items to be delivered by them set forth in Section 1.5.

(c)     Satisfaction of all obligations set forth in Section 5.1.

(d)     Assignment to Purchaser of the leases and contracts set forth in Section 4.4.

13

(e)      From the time of the signing of this Agreement to the Closing Date, there shall have been no material adverse change in the condition of the Purchased Assets, or the Assumed Liabilities.

(f)      The Bankruptcy Court in the Sale Order shall have made a finding that any commission or other amounts owed to Media Services Group, Inc. regarding any obligations of Seller pursuant to the Exclusive Station Marketing Agreement dated October 25, 2013, shall be paid at Closing from the Cash Purchase Price and that Purchaser shall have no liability therefor.

(g)      The Seller shall have delivered, or caused to be delivered, to Purchaser all of the documents reasonably requested by Purchaser to transfer to Purchaser all telephone and facsimile numbers, websites, e-mail addresses, apps, internet domain names, Facebook, Twitter, Instagram, LinkedIn and other social media accounts used in the business; and

(h)      There shall be no breach of the Financing Agreement or the Note (as defined in the Financing Agreement) issued in connection therewith, or the Security Agreement securing the Note.

5.3      <u>Conditions Precedent to Obligations of the Seller</u>. The obligations of the Seller to effect the Transactions are subject to the satisfaction of the following conditions at or prior to the Closing (unless expressly waived in writing by the Seller, in its discretion, at or prior to the Closing):

(a)      Purchaser shall have performed and complied in all material respects with all covenants and agreements herein required by this Agreement to be performed or complied with prior to the Closing by Purchaser; each of the representations and warranties of Purchaser contained in this Agreement shall be true and correct in all material respects on the Closing Date as though made on the Closing Date (except to the extent that they expressly relate to an earlier date); and there shall have been delivered to the Seller a certificate to such effect, dated as of the Closing Date, signed by a duly authorized officer of Purchaser.

(b)      Purchaser shall have tendered the Cash Purchase Price (minus the Escrow Funds and the applicable portion of the DIP Financing as provided for in Section 1.3(iii)(b)) in immediately available funds and delivered, or caused to be delivered, to the Seller all of the items to be delivered by it set forth in <u>Section 1.5</u>.

ARTICLE 6
<u>TERMINATION</u>

6.1      <u>Termination</u>. This Agreement and the Transactions may be terminated at any time prior to the Closing as follows:

(a)      by mutual express written agreement of the Seller and Purchaser and approval of the Bankruptcy Court;

(b)      by Purchaser or the Seller by written notice to the other Party, if the Closing shall not have occurred by the close of business on October 15, 2015 (the "Termination Date"); provided, however, if the Closing shall not have occurred on or before the Termination Date due to a breach of a Party's obligations to consummate the Closing and the non-breaching Party has indicated to the other Parties that it is willing to consummate the Closing, then the breaching Party may not terminate this Agreement pursuant to this Section 6.1(b);

(c)      by Purchaser by written notice to the Seller, if there shall be a breach by the Seller of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 5.2 and which breach cannot be cured or has not been cured by the earlier of (i) ten (10) Business Days after the giving of written notice by Purchaser to the Seller of such breach; and (ii) one (1) Business Day prior to the Termination Date;

(d)      by the Seller by written notice to Purchaser, if there shall be a breach by Purchaser of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 5.3 and which breach cannot be cured or has not been cured by the earlier of (i) ten (10) Business Days after the giving of written notice by the Seller to Purchaser of such breach; and (ii) one (1) Business Day prior to the Termination Date;

(e)      by the Seller or Purchaser by written notice to the other Party if there shall be in effect a final non-appealable order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the Transactions; it being agreed that the Parties shall promptly appeal any adverse determination which is not non-appealable (and pursue such appeal with reasonable diligence).

(f)      by Purchaser or the Seller, if the Bankruptcy Court declines to enter the Sale Order; or

(g)      by Purchaser, if, as of the Closing Date, there exists a material adverse change, including but not limited to the cessation of broadcast operations for more than five (5) Business Days during the period between the date of this Agreement and the Closing Date.

(h)      by Purchaser, if there is an uncured default under the Financing Agreement or the Note (as defined in the Financing Agreement) issued in connection therewith, or the Security Agreement securing the Note.

6.2      Effect of Termination.  If this Agreement shall be terminated pursuant to this Article 6, all further obligations of the Parties under this Agreement shall be terminated without further liability of any Party to the other (other than Section 4.1, Section 6.2 and Article 7 (other than Section 7.1) which sections shall survive any termination of this Agreement); provided, however, that nothing herein shall relieve any Party from liability for its breach of this Agreement.

ARTICLE 7
MISCELLANEOUS PROVISIONS

7.1    Survival.  The covenants, obligations and agreements contained in this Agreement that are not performed at or before Closing shall survive and not be affected by Closing, and shall thereafter remain in full force and effect until paid and performed in full, including without limitation Purchaser's obligation to pay the Purchase Price, which upon Closing is an absolute and unconditional obligation which shall be paid when due without notice or demand and without set off or counterclaim.  The representations and warranties set forth in this Agreement shall survive for a period of one (1) year after Closing, upon which they shall expire and be of no further force or effect.

7.2    Entire Agreement.  This Agreement (including the Schedules and Exhibits hereto) and the other Transaction Documents represent the entire understanding and agreement between the Parties with respect to the subject matter hereof and supersedes all prior discussions and agreements between the Parties with respect to the subject matter hereof.  This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought.  No action taken pursuant to this Agreement, including, any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.  The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.  No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

7.3    Waiver of Trial by Jury.  THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT, OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 7.3.

7.4    Expenses.  Each of the Parties shall bear its own costs, including attorneys' fees, incurred in negotiating this Agreement and consummating the Transactions.

      7.5      <u>Governing Law; Jurisdiction</u>.  The validity, construction and performance of this Agreement, and any action arising out of or relating to this Agreement shall be governed by the Laws of the State of North Carolina, without regard to the Laws of the State of North Carolina as to choice or conflict of Laws or any Laws which would defer to the substantive Laws of any other jurisdiction.  With respect to any suit, action or proceedings relating to this Agreement which is permitted to be brought under this Agreement, each Party hereby irrevocably (i) submits to the exclusive jurisdiction of the courts of the State of North Carolina located in Orange County and the United States Bankruptcy Court and District Court located in the Middle District of North Carolina, and consents to the entry of final orders by the Bankruptcy Court on all matters brought before it; and (ii) waives any objection which it may have to the laying of venue of any such suit, action or proceedings brought in such court, waives any claim that such suit, action or proceedings have been brought in an inconvenient forum and further waives the right to object, with respect to such suit, action or proceedings, that such court does not have jurisdiction over it.  No Party to this Agreement shall institute a proceeding in any court to resolve a dispute between the Parties arising out of or related to this Agreement before that Party has sought to resolve the dispute through direct negotiation with the other Party. If the dispute is not resolved within five business days after a demand for direct negotiation, then either Party may seek relief from the appropriate court.

      7.6      <u>Notices</u>.  All notices and other communications under this Agreement shall be in writing and shall be deemed duly given (i) when delivered personally or by prepaid overnight courier, with a record of receipt; (ii) the fourth day after mailing if mailed by certified mail, return receipt requested; or (iii) the day of transmission, if sent by email, facsimile or telecopy during regular business hours or the Business Day after transmission, if sent after regular business hours (with a copy promptly sent by prepaid overnight courier with record of receipt or by certified mail, return receipt requested), to the Parties at the following addresses, email addresses or facsimile numbers (or to such other address, email address or facsimile number as a Party may have specified by notice given to the other Parties pursuant to this <u>Section 7.6</u>):

Seller:

VilCom Interactive Media, LLC
Attn: Everett B. Saslow, Jr., Chapter 11 Trustee
301 N. Elm St., Suite 700
PO Box 989 (27402)
Greensboro, NC 27401
Telephone:    336-379-1390
Facsimile:    336-379-1198

with a copy (which shall not constitute notice) to:

Northen Blue, LLP
Attn: John A. Northen
1414 Raleigh Rd., Suite 435
P.O. Box 2208 (27515-2208)
Chapel Hill, NC 27517

Telephone: 919-968-4441
Facsimile: 919-942-6603

Purchaser:

VIM Acquisition, LLC
Attn: Edward S. Holmes, Jr.
100 Europa Drive, Suite 550
Chapel Hill, NC 27517
Telephone:       (919) 929-9979 ext 209
Facsimile:       (919) 942-8606

with a copy (which shall not constitute notice) to:

Manning Fulton & Skinner, PA
Attn: William C. Smith, Esq.
PO Box 20389
Raleigh, NC 27619
Telephone:       (919) 510-9266
Facsimile:       (919) 325-4623

7.7    <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any Law, or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the Transactions is not affected in any manner adverse to any Party hereto.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner to the end that Transactions are fulfilled to the greatest extent possible.

7.8    <u>Successors and Assigns</u>.  This Agreement shall be binding upon the Parties and their respective successors and permitted assigns.  No assignment of this Agreement or of any rights or obligations hereunder may be made by the Seller or Purchaser (by operation of law or otherwise) without the prior written consent of the other Parties and any attempted assignment without the required consents shall be void; provided, however, that prior to the Closing, Purchaser may assign its right to purchase any of the Purchased Assets to one or more Affiliates of Purchaser, but no assignment shall relieve Purchaser of any obligation or liability under this Agreement.  Upon any such permitted assignment, the references in this Agreement to Purchaser shall also apply to any such assignee unless the context requires otherwise.

7.9    <u>No Third Party Beneficiaries</u>.  This Agreement shall inure solely to the benefit of the Parties and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any Person that is not a Party (or a successor or assign of any such Party) any legal or equitable right, benefit or remedy of any nature whatsoever, including any rights of employment for any specified period, under or by reason of this Agreement.

7.10      Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute a single agreement.  The signature pages hereto may be transmitted by facsimile or .pdf, and if so transmitted, shall constitute originals.

7.11      Specific Performance.  The Parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement to be performed were not performed in accordance with their specific terms or were otherwise breached or threatened to be breached and that an award of money damages would be inadequate in such event.  Accordingly, it is acknowledged that the Parties shall be entitled to equitable relief, without proof of actual damages, including an order for specific performance to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, in addition to any other remedy to which they are entitled at law or in equity as a remedy for any such breach or threatened breach.  Each Party further agrees that neither the other Parties nor any other Person shall be required to obtain, furnish or post any bond or similar instrument in connection with or as a condition to obtaining any remedy referred to in this Section 7.11, and each Party hereto irrevocably waives any right it may have to require the obtaining, furnishing or posting of any such bond or similar instrument. Each Party further agrees that the only permitted objection that it may raise in response to any action for equitable relief is that it contests the existence of a breach or threatened breach of this Agreement.

7.12      Time is of the Essence.  With respect to all dates and time periods set forth in this Agreement, time is of the essence regarding the Parties' performance and the Bankruptcy Court Approval and Closing of this Agreement

7.13      Mutual Releases. Seller, as debtor in its Chapter 11 Case and on behalf of itself and its bankruptcy estate, Bankruptcy Trustee, officers, directors, employees, successors and assigns shall hereby, effective at Closing, release, remise, acquit, and forever discharge Purchaser and Purchaser and its affiliates, officers, directors, employees, successors, and assigns from any and all damages, causes, actions, guaranties, demands, rights, costs, losses, expenses and other claims whatsoever which Seller now has or may hereafter have, including, but not limited to, those in any way relating to the Purchased Assets, any excluded assets, the Assumed Liabilities, any excluded liabilities, the business, or Station Employees. Except to the extent reserved herein, Purchaser on behalf of itself and its officers, directors, employees, parent, successors and assigns shall hereby, effective at Closing, release, remise, acquit, and forever discharge Seller from any and all damages, causes, actions, guaranties, demands, rights, costs, losses, expenses and other claims whatsoever which Purchaser now has or may hereafter have, including, but not limited to, those in any way relating to the Purchased Assets, any excluded assets, the Assumed Liabilities, any excluded liabilities, the business, or Station Employees; provided, however, that nothing herein shall be construed to release or relieve Seller and its bankruptcy estate, officers, directors, employees, successors and assigns from their obligations to perform this Agreement or from damage or equitable claims for material breach of this Agreement.  This release does not include any release of claims identified in proofs of claim filed by Edward Holmes against Seller, VilCom, LLC, or University Directories, LLC (claim #6 filed in VilCom Interactive Media, LLC, case 14-81181 North Carolina

19

Middle District Bankruptcy Court ("NCMB"); claim #4 in VilCom, LLC, case 14-81177 NCMB; and claim # 26 filed in University Directories, LLC, case 14-81184 NCMB).

      7.14     <u>Maintenance and Furnishing of Information</u>.

      (a)     Seller and Purchaser each agree that, for a period of six (6) years after the Closing Date (or such longer period as may be required by applicable Law), neither shall destroy or otherwise render unavailable any books, records, documents, data or other information relating principally to the conduct of the business or the ownership or operation of the Purchased Assets prior to the Closing Date (the "<u>Information</u>"), without first offering the other Party in writing the opportunity to copy or obtain possession thereof at such other Party's sole expense.

      (b)     Seller and Purchaser each agree to maintain easy and ready access and to make available to the other Party, at reasonable times after reasonable request therefore and at the requesting Party's sole expense, any information for the purpose of (i) preparing for, prosecuting or defending any suit, action, litigation or administration, arbitration or other proceeding or investigation (other than one by or against the non-requesting Party) by or against the requesting Party, including but not limited to claims objections and bankruptcy recoveries in Seller's bankruptcy case, (ii) preparing and filing any tax return or election relating to the Purchased Assets or the Assumed Liabilities and/or preparing for or defending any examination of tax or tax return by any governmental authority, or (iii) any other legitimate purpose ("<u>Authorized Purpose</u>"). The Party requesting such information shall reimburse the Party providing such Information for out-of-pocket costs and expenses incurred by the Party providing such Information. Notwithstanding any provision herein to the contrary, Purchaser shall provide the access and make available to Seller, as debtor, debtor-in-possession, or reorganized debtor, such information covered by the terms of this Section, without expense to Seller except for document copying charges, for a period of one year from the Closing Date.

      (c)     The access to files, books and records contemplated by this Section shall be during normal business hours and upon reasonable written request, shall be subject to such reasonable limitations as the Party having custody or control thereof may impose to preserve the confidentiality of information contained therein or to delete competitively sensitive information, shall not extend to any material subject to a claim of privilege unless expressly waived by the Party entitled to claim the same.

      7.15     <u>No Third Party Beneficiaries</u>. None of the provisions of this Agreement or any document contemplated hereby is intended to grant any right or benefit to any person or entity which is not a Party to this Agreement, except that Seller acknowledges and agrees that Purchaser is intended to be, and shall be treated as, a third-party beneficiary of this Agreement with respect to every provision herein that pertains to Purchaser.

ARTICLE 8
POST-CLOSING OBLIGATIONS

      8.1     <u>Receivables</u>. From and after Closing, Seller shall have no collection or other responsibility of any nature or kind with respect to Sellers receivables, except as follows:

      (a)     Seller and any duly appointed trustee in the Chapter 11 Case shall

notify Purchaser of any monies received by Seller post-Closing in payment of the Seller receivables and shall promptly remit same to Purchaser possession; and

       (b)    From and after Closing, Purchaser will be using the Purchased Assets to conduct business and generate its own accounts receivable ("Purchaser's Receivables"). Seller shall notify Purchaser of any monies received by Seller post-Closing in payment of Purchaser's Receivables and shall promptly remit same to Purchaser.

## ARTICLE 9
## DEFINITIONS

9.1        Definition of Certain Terms.  The terms defined in this Section 9.1, when capitalized, have the meanings indicated below in this Agreement.

"Action" means any action, suit, arbitration, claim, inquiry, proceeding or investigation by or before any Governmental Body of any nature, civil, criminal, regulatory or otherwise, in law or in equity.

"Affiliate" (and, with a correlative meaning "affiliated") means, with respect to any Person, any direct or indirect subsidiary of such Person, and any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with such first Person.  As used in this Agreement, "control" (including with correlative meanings, "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies (whether through ownership of securities or partnership or other ownership interests, by Contract or otherwise).

"Agreement" shall have the meaning set forth in the first paragraph.

"Application" shall have the meaning set forth in Section 4.10(b).

"Assets" shall have the meaning set forth in Section 1.1

"Assumed Liabilities" shall have the meaning set forth in Section 1.2.

"Authorized Purpose" shall have the meaning set forth in Section 7.14(b).

"Bankruptcy Code" shall mean title 11 of the United States Code, as amended.

"Bankruptcy Court Approval" shall mean the Bankruptcy Court's approval of this Agreement, the sale of the Purchased Assets and the assignment of the Contracts to Purchaser in accordance with the terms and conditions hereof. Bankruptcy Court Approval shall become effective upon entry of the Sale Order.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure and the Local Rules of the Bankruptcy Court.

"Bankruptcy Trustee" shall mean Everett B. Saslow, Jr.

21

"Bill of Sale" shall have the meaning set forth in Section 1.5(a).

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by Law to close. Any event the scheduled occurrence of which would fall on a day that is not a Business Day shall be deferred until the next succeeding Business Day.

"Call Letters" means WCHL.

"Cash Purchase Price" shall have the meaning set forth in Section 1.3.

"Chapter 11 Case" shall have the meaning set forth in the Recitals.

"Chapelboro" means the website located at http://chapelboro.com/.

"Closing" shall have the meaning set forth in Section 1.4.

"Closing Date" shall have the meaning set forth in Section 1.4.

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidential Information" shall have the meaning set forth in Section 4.18(b).

"Contract" means any agreement, contract, obligation or undertaking (whether written or oral and whether express or implied).

"Designated Station Programming Contracts" shall have the meaning set forth in Section 4.6.

 "FCC" means the United States Federal Communications Commission.

"FCC Consent" means the written consent of the FCC to the Application and the transfer to Purchaser of the FCC Licenses.

"FCC Licenses" means all Licenses issued by the FCC to Seller in connection with the business or operations of the Station, including the following:

- WCHL(AM), Chapel Hill, FCC Facility ID #70191, FCC File Number BR-20110725AEO, Expiring December 1, 2019

- W250BP, Chapel Hill, NC, FCC Facility ID # 147280, FCC File Number BLFT-20120815ABB, Expiring December 1, 2019

- KB96775, Broadcast Auxiliary Remote Pickup, Expiring December 1, 2019

- KF4221, Broadcast Auxiliary Remote Pickup, Expiring December 1, 2019

22

- KIQ412, Broadcast Auxiliary Remote Pickup, Expiring December 1, 2019

- WPWK404, Aural Studio Transmitter Link, Expiring December 1, 2019

- WQQU778, Aural Studio Transmitter Link, Expiring December 1, 2019

- Antenna Structure Registration 1048275 (TWR 1)

- Antenna Structure Registration 1048276 (TWR 2)

"Final Order" shall have the meaning set forth in Section 5.1(e).

"Governmental Body" means any entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to United States or foreign federal, state or local government, any governmental authority, agency, department, board, commission or instrumentality or any political subdivision thereof, and any tribunal or court or arbitrator(s) of competent jurisdiction, and shall include the FCC.

"Information" shall have the meaning set forth in Section 7.14(a).

"Intellectual Property" means all trade names, trademarks, service marks, copyrights, jingles, slogans, symbols, logos, domain names, websites and any other proprietary material or information, in whatever format or media, used or held for use by the Seller exclusively in the operation of the Station.

"IRS" means the United States Internal Revenue Service.

"Jones Ferry Location" shall have the meaning set forth in Section 4.4(d).

"Law" means any federal, state, local or foreign law (including common law), statute, code, ordinance, rule, or regulation or other requirement enacted, promulgated, issued or entered by a Governmental Body.

"Liability" means any and all debts, losses, liabilities, taxes, claims, damages, expenses, fines, costs, royalties, proceedings, deficiencies or obligations (including those arising out of any action, such as any settlement or compromise thereof or judgment or award therein), of any nature, whether known or unknown, absolute, contingent, accrued or unaccrued, liquidated or unliquidated, or otherwise and whether due or to become due, and whether in contract, tort, strict liability or otherwise, and whether or not resulting from third party claims, and any reasonable out-of-pocket costs and expenses in connection therewith (including reasonable legal counsels', accountants', or other fees and expenses incurred in defending any action or in investigating any of the same or in asserting any rights thereunder or hereunder).

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, charge, option, right of first refusal, right of first offer, easement, servitude, proxy, voting trust or agreement, transfer restriction under any shareholder or similar agreement or encumbrance or any other restriction or limitation whatsoever.

23

"Market" means geographic area covered by the 1.0 mV/m service contour of AM radio station WCHL(AM), Chapel Hill, NC, FCC Facility ID #70191.

"Parties" or "Party" shall have the meaning set forth in the first paragraph.

"Permits" means any approvals, authorizations, consents, licenses, permits or certificates of a Governmental Body.

"Person" means and includes natural persons, corporations, limited partnerships, limited liability companies, general partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, and all Governmental Bodies.

"Petition Date" shall mean October 24, 2014.

"Purchase Price" shall have the meaning set forth in Section 1.3.

"Purchased Assets" shall have the meaning set forth in Section 1.1.

"Purchaser" shall have the meaning set forth in the first paragraph.

"Purchaser's Receivables" shall have the meaning set forth in Section 8.1(b).

"Sale Hearing" shall mean as further described in Section 4.21(b) the final hearing by the Bankruptcy Court to approve the proposed sale.

"Seller" shall have the meaning set forth in the first paragraph.

"Station" shall have the meaning set forth in Section 1.1.

"Station Employees" shall have the meaning set forth in Section 4.5.

"Station Programming Contracts" shall have the meaning set forth in Section 4.6.

"Subsidiary" or "subsidiary" means, with respect to any Person, any corporation, limited liability company, joint venture or partnership of which such Person beneficially owns or controls, either directly or indirectly, more than fifty percent (50%) of the total combined voting power or the total economic interest in such Person.

"Termination Date" shall have the meaning set forth in Section 6.1(b).

"Transaction Documents" shall mean this Agreement, the Bill of Sale, and any assignments sufficient to transfer ownership of the applicable Purchased Assets.

"Transactions" means the transactions contemplated by this Agreement and the other Transaction Documents.

9.2        <u>Interpretation</u>.

(a)        Whenever the words "<u>include</u>," "<u>includes</u>" or "<u>including</u>" are used in this Agreement, they will be deemed to be followed by the words "<u>without limitation.</u>"  Any singular term in this Agreement will be deemed to include the plural, and any plural term the singular.  All pronouns and variations thereof will be deemed to refer to the feminine, masculine or neuter, singular or plural, as the identity of the Person referred to may require.

(b)        Any agreement, instrument or statute defined or referred to herein or in any agreement or instrument that is referred to herein means such agreement, instrument or statute as from time to time amended, modified or supplemented including (in the case of agreements or instruments) by waiver or consent and (in the case of statutes) by succession of comparable successor statutes and references to all attachments thereto and instruments incorporated therein.  References to a Person are also to the Person's successors and permitted assigns, as applicable.

(c)        This Agreement is the product of negotiations among the Parties, each of which is represented by legal counsel, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Rules of construction relating to interpretation against the drafter of an agreement shall not apply to this Agreement and are expressly waived by each Party.

*[remainder of page intentionally left blank]*

25

(Signature Page to Asset Purchase Agreement)

IN WITNESS WHEREOF, each of the Parties has executed this Asset Purchase Agreement as of the date first set forth above.

VILCOM INTERACTIVE MEDIA, LLC

By: _____
     Everett B. Saslow, Jr., Trustee

VIM ACQUISITION, LLC

By: _____
     Edward S. Holmes, Jr.

For the limited purpose set forth in Section 1.3 above.

By: _____
     Everett B. Saslow, Jr., Trustee

LIST OF EXHIBITS AND SCHEDULES

Exhibits

Exhibit 1.5(a)                    Form of Bill of Sale


Schedules

Schedule 1.1                      List of Assets

Schedule 1.2                      List of Prepetition and/or Post-petition Trade Payables

Schedule 2.5                      List of Intellectual Property Assets

Schedule 2.6                      List of Licenses

Schedule 2.7                      Exceptions to Claims and Legal Actions

Schedule 4.18(b) – Part 1         List of Assigned Contracts

Schedule 4.18(b) – Part 2         List of Advertising Contracts

Schedule 4.19                     List of Employees

ASSET PURCHASE AGREEMENT

Exhibit 1.5(a)

Form of Bill of Sale

**BILL OF SALE AND ASSIGNMENT**

Pursuant to that Asset Purchase Agreement (the "Agreement") dated as of July 10, 2015 between VIM Acquisition, LLC, a North Carolina limited liability company (the "Purchaser"), and VilCom Interactive Media, LLC, a North Carolina limited liability company (the "Seller"), as of _____, 2015, the Seller hereby sells, transfers and assigns to the Purchaser all of the Purchased Assets (as defined in the Agreement).

This Bill of Sale and Assignment is entered into pursuant to and is subject to all of the terms of the Agreement, and nothing herein shall be deemed to modify any of the representations, warranties, covenants and obligations of the parties thereunder.

All capitalized terms used and not otherwise defined herein shall have the meanings set forth in the Agreement.

In the event of any conflict or inconsistency between the terms, provisions and conditions of this Bill of Sale and Assignment and the Agreement, the terms, provisions and conditions of the Agreement shall govern.

This Bill of Sale and Assignment shall be construed and enforced in accordance with, and all questions concerning the construction, validity, interpretation and performance of this Bill of Sale and Assignment shall be governed by, the laws of the State of North Carolina, without giving effect to provisions thereof regarding conflict of laws.

In Witness Whereof, the undersigned has executed this Bill of Sale and Assignment as of the date and year first above written

SELLER:

VilCom Interactive Media, LLC

By: _____

Name: _____

Title: _____

ASSET PURCHASE AGREEMENT

Schedule 1.1

List of Assets

All Assets as listed in Section 1.1, including but not limited to the following:

1. See attached VilCom Interactive Media, LLC Depreciation Expense Report as of December 31, 2014 (Pages 1 – 8).

2. Life Insurance Policy #82 263 807 dated October 27, 2009 with John Hancock, as Carrier, payable upon the death of James A. Heavner, as insured, in the amount of $1,000,000.00, with Seller as the Owner and Beneficiary.

# VilCom Interactive Media, LLC
## Depreciation Expense Report
### As of December 31, 2014

Book = Internal

FYE Month = December

| Sys No | Ext | In Svc Date | Acquired Value | P T | Depr Meth | Est Life | Salv/168 Allow Sec 179 | Depreciable Basis | Prior Thru | Prior Accum Depreciation | Depreciation This Run | Current YTD Depreciation | Current Accum Depreciation | Key Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 000022 | | SOLID Embedded Engine End User License | | | | | | | | | | | | |
| | 000 | 10/27/00 | 5,790.00 | P | SLMM | 03 00 | 0.00 | 5,790.00 | 12/31/00 | 5,790.00 | 5,468.33 | 0.00 | 5,790.00 | |
| 000023 | | Gray Desk Chair | | | | | | | | | | | | |
| | 000 | 10/05/00 | 131.02 | P | SLMM | 05 00 | 0.00 | 131.02 | | 131.02 | 131.02 | 0.00 | 131.02 | |
| 000024 | | Gray Desk Chair | | | | | | | | | | | | |
| | 000 | 10/05/00 | 131.02 | P | SLMM | 05 00 | 0.00 | 131.02 | | 131.02 | 131.02 | 0.00 | 131.02 | |
| 000025 | | Gray Desk Chair | | | | | | | | | | | | |
| | 000 | 10/05/00 | 131.02 | P | SLMM | 05 00 | 0.00 | 131.02 | | 131.02 | 131.02 | 0.00 | 131.02 | |
| 000026 | | Gray Desk Chair | | | | | | | | | | | | |
| | 000 | 10/05/00 | 133.48 | P | SLMM | 05 00 | 0.00 | 133.48 | | 133.48 | 133.48 | 0.00 | 133.48 | |
| 000031 | | Studio Equipment | | | | | | | | | | | | |
| | 000 | 07/20/00 | 4,311.25 | P | SLMM | 03 00 | 0.00 | 4,311.25 | | 4,311.25 | 4,311.25 | 0.00 | 4,311.25 | |
| 000033 | | Wiring of WCHL Studio | | | | | | | | | | | | |
| | 000 | 11/02/02 | 11,242.85 | P | SLMM | 05 00 | 0.00 | 11,242.85 | | 11,242.85 | 11,242.85 | 0.00 | 11,242.85 | |
| 000034 | | Installed HVAC Box in Studio | | | | | | | | | | | | |
| | 000 | 11/13/02 | 1,051.75 | P | SLMM | 05 00 | 0.00 | 1,051.75 | | 1,051.75 | 1,051.75 | 0.00 | 1,051.75 | |
| 000035 | | Coleman Powermater Generator Model#PM0496504.17 | | | | | | | | | | | | |
| | 000 | 12/04/02 | 1,682.36 | P | SLMM | 05 00 | 0.00 | 1,682.36 | | 1,682.36 | 1,682.36 | 0.00 | 1,682.36 | |
| 000036 | | Generac 7000 EXL Generator Model#01470 | | | | | | | | | | | | |
| | 000 | 12/04/02 | 1,179.13 | P | SLMM | 05 00 | 0.00 | 1,179.13 | | 1,179.13 | 1,179.13 | 0.00 | 1,179.13 | |
| 000037 | | Samson 4CH Stereo HD Phne AMP | | | | | | | | | | | | |
| | 000 | 02/05/03 | 115.87 | P | SLMM | 05 00 | 0.00 | 115.87 | | 115.87 | 115.87 | 0.00 | 115.87 | |
| 000038 | | Tools DC-A Dail up;DBX MIC Processor | | | | | | | | | | | | |
| | 000 | 02/05/03 | 793.40 | P | SLMM | 05 00 | 0.00 | 793.40 | | 793.40 | 793.40 | 0.00 | 793.40 | |
| 000039 | | Sony Mini Disc Recorder | | | | | | | | | | | | |
| | 000 | 02/10/03 | 177.64 | P | SLMM | 05 00 | 0.00 | 177.64 | | 177.64 | 177.64 | 0.00 | 177.64 | |
| 000040 | | Gentner Digital Hybrid | | | | | | | | | | | | |
| | 000 | 08/28/03 | 965.78 | P | SLMM | 05 00 | 0.00 | 965.78 | | 965.78 | 965.78 | 0.00 | 965.78 | |
| 000041 | | Radio Station Uplit | | | | | | | | | | | | |
| | 000 | 01/16/03 | 31,297.00 | P | SLMM | 05 00 | 0.00 | 31,297.00 | | 31,297.00 | 31,297.00 | 0.00 | 31,297.00 | |
| 000042 | | Power Tube | | | | | | | | | | | | |
| | 000 | 09/03/03 | 1,368.17 | P | SLMM | 05 00 | 0.00 | 1,368.17 | | 1,368.17 | 1,368.17 | 0.00 | 1,368.17 | |
| 000043 | | Conex Cell Phone Interface | | | | | | | | | | | | |
| | 000 | 08/28/03 | 369.66 | P | SLMM | 05 00 | 0.00 | 369.66 | | 369.66 | 369.66 | 0.00 | 369.66 | |
| 000044 | | Dell Dimension 2400 Series P4;Optical Mouse;Soundblaster Live(2) | | | | | | | | | | | | |
| | 000 | 09/08/03 | 815.33 | P | SLMM | 03 00 | 0.00 | 815.33 | | 815.33 | 815.33 | 0.00 | 815.33 | |
| 000045 | | 4 - APC Back-up RS 1500VA | | | | | | | | | | | | |
| | 000 | 09/08/03 | 1,111.70 | P | SLMM | 05 00 | 0.00 | 1,111.70 | | 1,111.70 | 1,111.70 | 0.00 | 1,111.70 | |
| 000047 | | Microsoft Windows XP Pro Upgrade | | | | | | | | | | | | |
| | 000 | 09/30/03 | 213.99 | P | SLMM | 03 00 | 0.00 | 213.99 | | 213.99 | 213.99 | 0.00 | 213.99 | |
| 000049 | | Microsoft PowerPoint 2002 | | | | | | | | | | | | |
| | 000 | 07/21/03 | 215.46 | P | SLMM | 03 00 | 0.00 | 215.46 | | 215.46 | 215.46 | 0.00 | 215.46 | |
| 000050 | | 3 - Sony Mini Disk Player/Recorders | | | | | | | | | | | | |
| | 000 | 03/10/03 | 550.40 | P | SLMM | 05 00 | 0.00 | 550.40 | | 550.40 | 550.40 | 0.00 | 550.40 | |
| 000054 | | Dell Dimension 2350 Series Intel Celeron Processor | | | | | | | | | | | | |
| | 000 | 02/27/03 | 741.54 | P | SLMM | 03 00 | 0.00 | 741.54 | | 741.54 | 741.54 | 0.00 | 741.54 | |
| 000055 | | Dell Dimension 2350 Series Intel Pentium 4 Processor | | | | | | | | | | | | |
| | 000 | 02/12/03 | 1,121.36 | P | SLMM | 03 00 | 0.00 | 1,121.36 | | 1,121.36 | 1,121.36 | 0.00 | 1,121.36 | |
| 000056 | | Dell Dimension 2350 Series Intel Pentium 4 Processor | | | | | | | | | | | | |
| | 000 | 02/12/03 | 1,121.36 | P | SLMM | 03 00 | 0.00 | 1,121.36 | | 1,121.36 | 1,121.36 | 0.00 | 1,121.36 | |
| 000057 | | iMediaTouch Production Software | | | | | | | | | | | | |
| | 000 | 02/04/03 | 1,095.00 | P | SLMM | 03 00 | 0.00 | 1,095.00 | | 1,095.00 | 1,095.00 | 0.00 | 1,095.00 | |
| 000058 | | Auralex Studioform;Sound Blaster;Nero v5.5/5.0 | | | | | | | | | | | | |

# VilCom Interactive Media, LLC
## Depreciation Expense Report
### As of December 31, 2014

Book = Internal

FYE Month = December

| Sys No | Ext | In Svc Date | Acquired Value | P T | Depr Meth | Est Life | Salv/168 Allow Sec 179 | Depreciable Basis | Prior Thru | Prior Accum Depreciation | Depreciation This Run | Current YTD Depreciation | Current Accum Depreciation | Key Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 000 | 01/13/03 | 1,527.26 | P | SLMM | 05 00 | 0.00 | 1,527.26 | | 1,527.26 | 1,527.26 | 0.00 | 1,527.26 | |
| 000061 | | Dell Intel Pentium 4 Processor | | | | | | | | | | | | |
| | 000 | 01/13/03 | 1,153.47 | P | SLMM | 03 00 | 0.00 | 1,153.47 | | 1,153.47 | 1,153.47 | 0.00 | 1,153.47 | |
| 000062 | | Installation of Automation System | | | | | | | | | | | | |
| | 000 | 01/01/03 | 18,375.00 | P | SLMM | 05 00 | 0.00 | 18,375.00 | | 18,375.00 | 18,375.00 | 0.00 | 18,375.00 | |
| 000063 | | Installed Speakers in Office Suites | | | | | | | | | | | | |
| | 000 | 01/20/03 | 621.40 | P | SLMM | 05 00 | 0.00 | 621.40 | | 621.40 | 621.40 | 0.00 | 621.40 | |
| 000064 | | 2-Ton Heat Pump System | | | | | | | | | | | | |
| | 000 | 02/10/03 | 4,300.00 | P | SLMM | 05 00 | 0.00 | 4,300.00 | | 4,300.00 | 4,300.00 | 0.00 | 4,300.00 | |
| 000065 | | Mackie 14X2 Mixer;3 - Shureagile UHF H/H Sustem | | | | | | | | | | | | |
| | 002 | 03/21/03 | 3,424.16 | P | SLMM | 05 00 | 0.00 | 3,424.16 | | 3,424.16 | 3,424.16 | 0.00 | 3,424.16 | |
| 000066 | | Conex Cell Phone | | | | | | | | | | | | |
| | 000 | 09/08/03 | 414.38 | P | SLMM | 05 00 | 0.00 | 414.38 | | 414.38 | 414.38 | 0.00 | 414.38 | |
| 000067 | | Conex Cell Phone | | | | | | | | | | | | |
| | 000 | 09/16/03 | 387.03 | P | SLMM | 05 00 | 0.00 | 387.03 | | 387.03 | 387.03 | 0.00 | 387.03 | |
| 000068 | | NWL Oil Capacitor | | | | | | | | | | | | |
| | 000 | 09/22/03 | 916.06 | P | SLMM | 05 00 | 0.00 | 916.06 | | 916.06 | 916.06 | 0.00 | 916.06 | |
| 000069 | | 25 KW Natural Gas Generator | | | | | | | | | | | | |
| | 000 | 05/07/03 | 7,250.00 | P | SLMM | 05 00 | 0.00 | 7,250.00 | | 7,250.00 | 7,250.00 | 0.00 | 7,250.00 | |
| 000070 | | Installed Generator | | | | | | | | | | | | |
| | 000 | 09/29/03 | 2,500.00 | P | SLMM | 05 00 | 0.00 | 2,500.00 | | 2,500.00 | 2,500.00 | 0.00 | 2,500.00 | |
| 000072 | | PRO TEK 15-HP GENERATOR | | | | | | | | | | | | |
| | 000 | 01/01/03 | 1,561.14 | P | SLMM | 05 00 | 0.00 | 1,561.14 | | 1,561.14 | 1,561.14 | 0.00 | 1,561.14 | |
| 000073 | | Built Cabinet and Countertop for Control Room | | | | | | | | | | | | |
| | 000 | 01/30/03 | 1,158.00 | P | SLMM | 05 00 | 0.00 | 1,158.00 | | 1,158.00 | 1,158.00 | 0.00 | 1,158.00 | |
| 000074 | | 2 Drawer Lateral File | | | | | | | | | | | | |
| | 000 | 03/29/03 | 299.59 | P | SLMM | 05 00 | 0.00 | 299.59 | | 299.59 | 299.59 | 0.00 | 299.59 | |
| 000075 | | 8x2 Switchers | | | | | | | | | | | | |
| | 000 | 02/01/03 | 1,689.20 | P | SLMM | 05 00 | 0.00 | 1,689.20 | | 1,689.20 | 1,689.20 | 0.00 | 1,689.20 | |
| 000076 | | Phone Hybrid | | | | | | | | | | | | |
| | 000 | 05/01/03 | 1,788.91 | P | SLMM | 05 00 | 0.00 | 1,788.91 | | 1,788.91 | 1,788.91 | 0.00 | 1,788.91 | |
| 000077 | | Equipment for Studio Set-up | | | | | | | | | | | | |
| | 000 | 01/01/03 | 37,946.83 | P | SLMM | 05 00 | 0.00 | 37,946.83 | | 37,946.83 | 37,946.83 | 0.00 | 37,946.83 | |
| 000078 | | Automation Software | | | | | | | | | | | | |
| | 000 | 01/01/03 | 6,757.71 | P | SLMM | 03 00 | 0.00 | 6,757.71 | | 6,757.71 | 6,757.71 | 0.00 | 6,757.71 | |
| 000079 | | Media Touch-Logger Software & Support | | | | | | | | | | | | |
| | 000 | 01/01/03 | 1,145.00 | P | SLMM | 03 00 | 0.00 | 1,145.00 | | 1,145.00 | 1,145.00 | 0.00 | 1,145.00 | |
| 000081 | | Tieline Patriot Pots Codec 15 Khz | | | | | | | | | | | | |
| | 000 | 01/01/03 | 4,789.42 | P | SLMM | 05 00 | 0.00 | 4,789.42 | | 4,789.42 | 4,789.42 | 0.00 | 4,789.42 | |
| 000082 | | Autcmation Software | | | | | | | | | | | | |
| | 000 | 02/01/03 | 4,312.00 | P | SLMM | 03 00 | 0.00 | 4,312.00 | | 4,312.00 | 4,312.00 | 0.00 | 4,312.00 | |
| 000084 | | Built and Installed Custom Console | | | | | | | | | | | | |
| | 000 | 01/01/03 | 3,275.00 | P | SLMM | 05 00 | 0.00 | 3,275.00 | | 3,275.00 | 3,275.00 | 0.00 | 3,275.00 | |
| 000085 | | Dell Intel Pentium 4 Processor | | | | | | | | | | | | |
| | 000 | 01/01/03 | 1,210.92 | P | SLMM | 03 00 | 0.00 | 1,210.92 | | 1,210.92 | 1,210.92 | 0.00 | 1,210.92 | |
| 000087 | | MNTR VWSN 15" LCD Flat Panel Monitor & Soundcards | | | | | | | | | | | | |
| | 000 | 01/01/03 | 638.07 | P | SLMM | 03 00 | 0.00 | 638.07 | | 638.07 | 638.07 | 0.00 | 638.07 | |
| 000088 | | Smartlink 5 Port Switch & SMC EZNET 16 Port Switch & PC Cards | | | | | | | | | | | | |
| | 000 | 01/01/03 | 276.86 | P | SLMM | 03 00 | 0.00 | 276.86 | | 276.86 | 276.86 | 0.00 | 276.86 | |
| 000090 | | USB Black 601 PS;Belkin ABCD auto Key/Vid/M | | | | | | | | | | | | |
| | 000 | 01/01/03 | 138.43 | P | SLMM | 03 00 | 0.00 | 138.43 | | 138.43 | 138.43 | 0.00 | 138.43 | |
| 000091 | | Dell Intel Pentium 4 Processor | | | | | | | | | | | | |
| | 000 | 01/01/03 | 1,232.21 | P | SLMM | 03 00 | 0.00 | 1,232.21 | | 1,232.21 | 1,232.21 | 0.00 | 1,232.21 | |

## VilCom Interactive Media, LLC
### Depreciation Expense Report
### As of December 31, 2014

Book = Internal

FYE Month = December

| Sys No Ext | In Svc Date | Acquired Value | P T | Depr Meth | Est Life | Salv/168 Allow Sec 179 | Depreciable Basis | Prior Thru | Prior Accum Depreciation | Depreciation This Run | Current YTD Depreciation | Current Accum Depreciation | Key Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 000092 | Dell Intel Pentium 4 Processor | | | | | | | | | | | |
| 000 | 01/01/03 | 1,232.21 | P | SLMM | 03 00 | 0.00 | 1,232.21 | | 1,232.21 | 1,232.21 | 0.00 | 1,232.21 | |
| 000093 | Cool Edit Pro 2.0 & Domain Name Subscription(villagepride.com) | | | | | | | | | | | |
| 000 | 01/01/03 | 284.00 | P | SLMM | 03 00 | 0.00 | 284.00 | | 284.00 | 284.00 | 0.00 | 284.00 | |
| 000094 | Auralex 2 Inch Pyramid Soundproofing | | | | | | | | | | | |
| 000 | 01/01/03 | 1,992.00 | P | SLMM | 05 00 | 0.00 | 1,992.00 | | 1,992.00 | 1,992.00 | 0.00 | 1,992.00 | |
| 000095 | Star Guide Digital Receiver | | | | | | | | | | | |
| 000 | 01/01/03 | 3,309.64 | P | SLMM | 05 00 | 0.00 | 3,309.64 | | 3,309.64 | 3,309.64 | 0.00 | 3,309.64 | |
| 000096 | Installing Transmitter | | | | | | | | | | | |
| 000 | 12/11/04 | 787.50 | P | SLMM | 05 00 | 0.00 | 787.50 | | 787.50 | 787.50 | 0.00 | 787.50 | |
| 000097 | Control Concepts Islaguard | | | | | | | | | | | |
| 000 | 12/06/04 | 693.77 | P | SLMM | 05 00 | 0.00 | 693.77 | | 693.77 | 693.77 | 0.00 | 693.77 | |
| 000098 | COMREX CTRL SRFC 9500-0780 | | | | | | | | | | | |
| 000 | 02/24/04 | 454.50 | P | SLMM | 05 00 | 0.00 | 454.50 | | 454.50 | 454.50 | 0.00 | 454.50 | |
| 000100 | HP LJ1300 Laser Printer | | | | | | | | | | | |
| 000 | 03/24/04 | 462.28 | P | SLMM | 03 00 | 0.00 | 462.28 | | 462.28 | 462.28 | 0.00 | 462.28 | |
| 000102 | Pentium 4 Processor at 2.80GHZ w/533MHZ front side bus | | | | | | | | | | | |
| 000 | 02/06/04 | 1,258.32 | P | SLMM | 03 00 | 0.00 | 1,258.32 | | 1,258.32 | 1,258.32 | 0.00 | 1,258.32 | |
| 000103 | Install wiring and surge suppressor for new transmitter | | | | | | | | | | | |
| 000 | 12/07/04 | 1,323.90 | P | SLMM | 05 00 | 0.00 | 1,323.90 | | 1,323.90 | 1,323.90 | 0.00 | 1,323.90 | |
| 000104 | Office Cubicle System | | | | | | | | | | | |
| 000 | 04/29/04 | 5,408.00 | P | SLMM | 05 00 | 0.00 | 5,408.00 | | 5,408.00 | 5,408.00 | 0.00 | 5,408.00 | |
| 000105 | HON 10500 Series Lateral File Drawer | | | | | | | | | | | |
| 000 | 11/05/04 | 348.20 | P | SLMM | 05 00 | 0.00 | 348.20 | | 348.20 | 348.20 | 0.00 | 348.20 | |
| 000106 | purchased AM Radio Station Towers | | | | | | | | | | | |
| 000 | 08/15/04 | 105,000.00 | P | SLMM | 10 00 | 0.00 | 105,000.00 | | 98,875.00 | 105,000.00 | 6,125.00 | 105,000.00 | |
| 000107 | 2-Transmitters; Various Broadcast Equipment | | | | | | | | | | | |
| 000 | 08/15/04 | 95,000.00 | P | SLMM | 07 00 | 0.00 | 95,000.00 | | 95,000.00 | 95,000.00 | 0.00 | 95,000.00 | |
| 000108 | Transmitter | | | | | | | | | | | |
| 000 | 01/01/05 | 41,642.80 | P | SLMM | 07 00 | 0.00 | 41,642.80 | | 41,642.80 | 41,642.80 | 0.00 | 41,642.80 | |
| 000110 | Licenses for the Traffic System | | | | | | | | | | | |
| 000 | 02/01/05 | 5,350.00 | P | SLMM | 03 00 | 0.00 | 5,350.00 | | 5,350.00 | 5,350.00 | 0.00 | 5,350.00 | |
| 000111 | 17" CRT Monitor | | | | | | | | | | | |
| 000 | 06/20/05 | 128.39 | P | SLMM | 03 00 | 0.00 | 128.39 | | 128.39 | 128.39 | 0.00 | 128.39 | |
| 000112 | Dell Dimension 4700 Desktop w/ speakers | | | | | | | | | | | |
| 000 | 06/20/05 | 845.32 | P | SLMM | 03 00 | 0.00 | 845.32 | | 845.32 | 845.32 | 0.00 | 845.32 | |
| 000113 | Dell Computer | | | | | | | | | | | |
| 000 | 01/05/06 | 1,454.38 | P | SLMM | 03 00 | 0.00 | 1,454.38 | | 1,454.38 | 1,454.38 | 0.00 | 1,454.38 | |
| 000114 | Dell Computer | | | | | | | | | | | |
| 000 | 01/05/06 | 1,454.38 | P | SLMM | 03 00 | 0.00 | 1,454.38 | | 1,454.38 | 1,454.38 | 0.00 | 1,454.38 | |
| 000116 | Dell Computer | | | | | | | | | | | |
| 000 | 01/05/06 | 1,142.93 | P | SLMM | 03 00 | 0.00 | 1,142.93 | | 1,142.93 | 1,142.93 | 0.00 | 1,142.93 | |
| 000117 | EMAIL SERVER | | | | | | | | | | | |
| 000 | 01/25/07 | 1,603.52 | P | SLMM | 03 00 | 0.00 | 1,603.52 | | 1,603.52 | 1,603.52 | 0.00 | 1,603.52 | |
| 000118 | 2 DELL POWEREDGE 840 SERVERS | | | | | | | | | | | |
| 000 | 01/08/07 | 2,338.01 | P | SLMM | 03 00 | 0.00 | 2,338.01 | | 2,338.01 | 2,338.01 | 0.00 | 2,338.01 | |
| 000119 | 32 K W DIESEL GENERATOR | | | | | | | | | | | |
| 000 | 12/28/07 | 16,000.00 | P | SLMM | 05 00 | 0.00 | 16,000.00 | | 16,000.00 | 16,000.00 | 0.00 | 16,000.00 | |
| 000120 | Replaced Stolen Equip-Tieline Commander G3 POTS CODEC, Portable | | | | | | | | | | | |
| 000 | 09/19/07 | 2,633.34 | P | SLMM | 05 00 | 0.00 | 2,633.34 | | 2,633.34 | 2,633.34 | 0.00 | 2,633.34 | |
| 000121 | Repalced Stolen Equip-MACKIE MIXER | | | | | | | | | | | |
| 000 | 09/19/07 | 340.55 | P | SLMM | 05 00 | 0.00 | 340.55 | | 340.55 | 340.55 | 0.00 | 340.55 | |
| 000122 | Replaced Stolen Equip-MACKIE RACK KIT | | | | | | | | | | | |

## VilCom Interactive Media, LLC
### Depreciation Expense Report
### As of December 31, 2014

Book = Internal

FYE Month = December

| Sys No | Ext | In Svc Date | Acquired Value | P T | Depr Meth | Est Life | Salv/168 Allow Sec 179 | Depreciable Basis | Prior Thru | Prior Accum Depreciation | Depreciation This Run | Current YTD Depreciation | Current Accum Depreciation | Key Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 000 | 09/19/07 | 39.54 | P | SLMM | 05 00 | 0.00 | 39.54 |  | 39.54 | 39.54 | 0.00 | 39.54 |  |
| 000123 | Replaced Stolen Equip-2-Behringer Headphone AMP 800 | | | | | | | | | | | | | |
|  | 000 | 09/19/07 | 78.92 | P | SLMM | 05 00 | 0.00 | 78.92 |  | 78.92 | 78.92 | 0.00 | 78.92 |  |
| 000124 | Replaced Stolen Equip-10 NEUTRIK MALE XLR | | | | | | | | | | | | | |
|  | 000 | 09/19/07 | 22.50 | P | SLMM | 05 00 | 0.00 | 22.50 |  | 22.50 | 22.50 | 0.00 | 22.50 |  |
| 000125 | Replaced Stolen Equip-10-NEUTRIK FEMALE | | | | | | | | | | | | | |
|  | 000 | 09/19/07 | 23.50 | P | SLMM | 05 00 | 0.00 | 23.50 |  | 23.50 | 23.50 | 0.00 | 23.50 |  |
| 000126 | Replaced Stolen Equip-150 CANARE QUAD MIC CABLE | | | | | | | | | | | | | |
|  | 000 | 09/19/07 | 78.00 | P | SLMM | 05 00 | 0.00 | 78.00 |  | 78.00 | 78.00 | 0.00 | 78.00 |  |
| 000127 | Replaced Stolen Equip-5- BEYER HEADSET CONNECTORS | | | | | | | | | | | | | |
|  | 000 | 09/19/07 | 1,075.00 | P | SLMM | 05 00 | 0.00 | 1,075.00 |  | 1,075.00 | 1,075.00 | 0.00 | 1,075.00 |  |
| 000128 | VOSTRO 400 FOR NEWS DEPARTMENT | | | | | | | | | | | | | |
|  | 000 | 06/01/08 | 1,029.68 | P | SLMM | 03 00 | 0.00 | 1,029.68 |  | 1,029.68 | 1,029.68 | 0.00 | 1,029.68 |  |
| 000129 | DELL COMPUTER AND MONITOR FOR NEWS DEPARTMENT | | | | | | | | | | | | | |
|  | 000 | 07/28/08 | 999.68 | P | SLMM | 03 00 | 0.00 | 999.68 |  | 999.68 | 999.68 | 0.00 | 999.68 |  |
| 000130 | VOSTRO DELL COMPUTER FOR NEWS | | | | | | | | | | | | | |
|  | 000 | 01/13/09 | 824.27 | P | SLMM | 03 00 | 0.00 | 824.27 |  | 824.27 | 824.27 | 0.00 | 824.27 |  |
| 000131 | HP/CAMPAQ DESKTOP FOR SPECIAL HOUR ROOM | | | | | | | | | | | | | |
|  | 000 | 01/29/09 | 671.72 | P | SLMM | 03 00 | 0.00 | 671.72 |  | 671.72 | 671.72 | 0.00 | 671.72 |  |
| 000132 | DELL LATITUDE E4200 LAPTOP | | | | | | | | | | | | | |
|  | 000 | 09/30/09 | 2,972.58 | P | SLMM | 03 00 | 0.00 | 2,972.58 |  | 2,972.58 | 2,972.58 | 0.00 | 2,972.58 |  |
| 000133 | COMPUTER FOR NEWS DEPARTMENT | | | | | | | | | | | | | |
|  | 000 | 02/12/10 | 599.52 | P | SLMM | 03 00 | 0.00 | 599.52 |  | 599.52 | 599.52 | 0.00 | 599.52 |  |
| 000134 | DESKTOP COMPUTER FOR PRODUCTION DEPARTMENT | | | | | | | | | | | | | |
|  | 000 | 04/16/10 | 494.54 | P | SLMM | 03 00 | 0.00 | 494.54 |  | 494.54 | 494.54 | 0.00 | 494.54 |  |
| 000136 | ADOBE PHOTOSHOP CS5 | | | | | | | | | | | | | |
|  | 000 | 11/12/10 | 753.17 | P | SLMM | 03 00 | 0.00 | 753.17 |  | 753.17 | 753.17 | 0.00 | 753.17 |  |
| 000137 | DIGITAL RECORDER | | | | | | | | | | | | | |
|  | 000 | 04/16/10 | 176.61 | P | SLMM | 03 00 | 0.00 | 176.61 |  | 176.61 | 176.61 | 0.00 | 176.61 |  |
| 000138 | DIGITAL RECORDER | | | | | | | | | | | | | |
|  | 000 | 04/16/10 | 176.60 | P | SLMM | 03 00 | 0.00 | 176.60 |  | 176.60 | 176.60 | 0.00 | 176.60 |  |
| 000139 | MICROTRACT RECORDER | | | | | | | | | | | | | |
|  | 000 | 05/13/10 | 235.29 | P | SLMM | 03 00 | 0.00 | 235.29 |  | 235.29 | 235.29 | 0.00 | 235.29 |  |
| 000140 | UNC SURPLUS STORE-4-CHAIRS; 1-FILE CABINET; 5-DESKS | | | | | | | | | | | | | |
|  | 000 | 02/23/10 | 150.00 | P | SLMM | 00 01 | 0.00 | 150.00 |  | 150.00 | 150.00 | 0.00 | 150.00 |  |
| 000141 | 6-CHAIRS | | | | | | | | | | | | | |
|  | 000 | 07/31/10 | 689.94 | P | SLMM | 05 00 | 0.00 | 689.94 |  | 471.48 | 609.47 | 137.99 | 609.47 |  |
| 000142 | 1997 Ford E150 Van | | | | | | | | | | | | | |
|  | 000 | 10/12/00 | 11,269.08 | P | SLMM | 03 00 | 0.00 | 11,269.08 | 07/31/09 | 11,269.08 | 0.00 | 0.00 | 11,269.08 |  |
| 000143 | CONFERENCE TABLE 48in DIAMETER, MEDIUM OAK | | | | | | | | | | | | | |
|  | 000 | 10/27/09 | 393.73 | P | SLMM | 05 00 | 0.00 | 393.73 |  | 328.13 | 393.73 | 65.60 | 393.73 |  |
| 000144 | FOUR BLACK LEATHER GUEST CHAIRS | | | | | | | | | | | | | |
|  | 000 | 10/27/09 | 463.20 | P | SLMM | 05 00 | 0.00 | 463.20 |  | 386.00 | 463.20 | 77.20 | 463.20 |  |
| 000145 | EXECUTIVE HI-BACK BLACK LEATHER CHAIR | | | | | | | | | | | | | |
|  | 000 | 10/19/09 | 249.09 | P | SLMM | 05 00 | 0.00 | 249.09 |  | 207.58 | 249.09 | 41.51 | 249.09 |  |
| 000146 | RIGHT SINGLE PEDESTAL DESK 66 in x30inx29-1/2 in MEDIUM OAK | | | | | | | | | | | | | |
|  | 000 | 10/21/09 | 871.22 | P | SLMM | 05 00 | 0.00 | 871.22 |  | 726.00 | 871.22 | 145.22 | 871.22 |  |
| 000147 | LEFT RETURN, FLIE/FILE, 48inx24 inx29-7/2 in MEDIUM OAK | | | | | | | | | | | | | |
|  | 000 | 10/21/09 | 648.51 | P | SLMM | 05 00 | 0.00 | 648.51 |  | 540.43 | 648.51 | 108.08 | 648.51 |  |
| 000148 | 2-DRAWER LATERAL FILE, 36inx20in 29-5/8 in, MEDIUM OAK | | | | | | | | | | | | | |
|  | 000 | 10/21/09 | 625.37 | P | SLMM | 05 00 | 0.00 | 625.37 |  | 521.13 | 625.37 | 104.24 | 625.37 |  |
| 000149 | BOOKCASE, 5-SELF, 36inx13-12-1/8 inx71in, MEDIUM OAK | | | | | | | | | | | | | |
|  | 000 | 10/21/09 | 543.57 | P | SLMM | 05 00 | 0.00 | 543.57 |  | 452.97 | 543.57 | 90.60 | 543.57 |  |

## VilCom Interactive Media, LLC
### Depreciation Expense Report
### As of December 31, 2014

Book = Internal
FYE Month = December

| Sys No | Ext | In Svc Date | Acquired Value | P T | Depr Meth | Est Life | Salv/168 Allow Sec 179 | Depreciable Basis | Prior Thru | Prior Accum Depreciation | Depreciation This Run | Current YTD Depreciation | Current Accum Depreciation | Key Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 000150 | | KEYBROAD PLATFORM, LAMINATE, 21-1/2 INX10 IN, MEDIUM OAK | | | | | | | | | | | | |
| | 000 | 10/27/09 | 107.77 | P | SLMM | 05 00 | 0.00 | 107.77 | | 89.79 | 107.77 | 17.98 | 107.77 | |
| 000151 | | TIELINE 2RU COMMANDER G3 POTS CODEC WITH VOIP | | | | | | | | | | | | |
| | 000 | 12/05/08 | 3,432.59 | P | SLMM | 03 00 | 0.00 | 3,432.59 | | 3,432.59 | 3,432.59 | 0.00 | 3,432.59 | |
| 000152 | | 22" Widescreen Monitor, Wireless Keyboard & Mouse | | | | | | | | | | | | |
| | 000 | 01/23/11 | 235.47 | P | SLMM | 03 00 | 0.00 | 235.47 | | 228.93 | 235.47 | 6.54 | 235.47 | |
| 000153 | | Laptop, Docking Station w/Video;Keyboard & Mouse | | | | | | | | | | | | |
| | 000 | 02/10/11 | 1,306.95 | P | SLMM | 03 00 | 0.00 | 1,306.95 | | 1,270.65 | 1,306.95 | 36.30 | 1,306.95 | |
| 000154 | | Laptop and Docking Station w/video | | | | | | | | | | | | |
| | 000 | 02/10/11 | 1,261.57 | P | SLMM | 03 00 | 0.00 | 1,261.57 | | 1,226.52 | 1,261.57 | 35.05 | 1,261.57 | |
| 000155 | | Vostro 3500 Computer | | | | | | | | | | | | |
| | 000 | 03/21/11 | 837.20 | P | SLMM | 03 00 | 0.00 | 837.20 | | 767.44 | 837.20 | 69.76 | 837.20 | |
| 000156 | | Vostro 3500 Computer Window 7 Professional | | | | | | | | | | | | |
| | 000 | 04/02/11 | 830.90 | P | SLMM | 03 00 | 0.00 | 830.90 | | 761.67 | 830.90 | 69.23 | 830.90 | |
| 000158 | | Vostro 260 Desktop | | | | | | | | | | | | |
| | 000 | 09/25/11 | 971.08 | P | SLMM | 03 00 | 0.00 | 971.08 | | 728.30 | 971.08 | 242.78 | 971.08 | |
| 000159 | | Vostro 260 Desktop | | | | | | | | | | | | |
| | 000 | 09/25/11 | 971.07 | P | SLMM | 03 00 | 0.00 | 971.07 | | 728.30 | 971.07 | 242.77 | 971.07 | |
| 000160 | | Dell Vostro Laptop $ Docking Station | | | | | | | | | | | | |
| | 000 | 09/29/11 | 1,064.73 | P | SLMM | 03 00 | 0.00 | 1,064.73 | | 798.55 | 1,064.73 | 266.18 | 1,064.73 | |
| 000161 | | Dell Vostro 3450 COmputer | | | | | | | | | | | | |
| | 000 | 12/30/11 | 827.76 | P | SLMM | 03 00 | 0.00 | 827.76 | | 551.84 | 827.76 | 275.92 | 827.76 | |
| 000162 | | Symantec | | | | | | | | | | | | |
| | 000 | 03/31/11 | 832.75 | P | SLMM | 03 00 | 0.00 | 832.75 | | 763.35 | 832.75 | 69.40 | 832.75 | |
| 000163 | | Microsoft Office | | | | | | | | | | | | |
| | 000 | 04/07/11 | 126.04 | P | SLMM | 03 00 | 0.00 | 126.04 | | 115.53 | 126.04 | 10.51 | 126.04 | |
| 000164 | | Microsoft Office | | | | | | | | | | | | |
| | 000 | 04/08/11 | 235.45 | P | SLMM | 03 00 | 0.00 | 235.45 | | 215.82 | 235.45 | 19.63 | 235.45 | |
| 000165 | | Quickbooks Software | | | | | | | | | | | | |
| | 000 | 08/31/11 | 754.85 | P | SLMM | 03 00 | 0.00 | 754.85 | | 587.11 | 754.85 | 167.74 | 754.85 | |
| 000166 | | Mackie Compact Mixer | | | | | | | | | | | | |
| | 000 | 04/28/11 | 969.74 | P | SLMM | 05 00 | 0.00 | 969.74 | | 517.20 | 711.15 | 193.95 | 711.15 | |
| 000167 | | Nikon DX3100 Digital Camera | | | | | | | | | | | | |
| | 000 | 05/18/11 | 462.59 | P | SLMM | 05 00 | 0.00 | 462.59 | | 239.02 | 331.54 | 92.52 | 331.54 | |
| 000168 | | Office ECoil46 Binding Machine | | | | | | | | | | | | |
| | 000 | 07/31/11 | 487.13 | P | SLMM | 05 00 | 0.00 | 487.13 | | 235.47 | 332.90 | 97.43 | 332.90 | |
| 000169 | | Wireless Microphone | | | | | | | | | | | | |
| | 000 | 08/31/11 | 479.31 | P | SLMM | 05 00 | 0.00 | 479.31 | | 223.67 | 319.53 | 95.86 | 319.53 | |
| 000172 | | Computer | | | | | | | | | | | | |
| | 000 | 01/25/12 | 736.52 | P | SLMM | 03 00 | 0.00 | 736.52 | | 470.56 | 716.07 | 245.51 | 716.07 | |
| 000174 | | 2-2TB Back up Drives | | | | | | | | | | | | |
| | 000 | 11/30/12 | 304.18 | P | SLMM | 03 00 | 0.00 | 304.18 | | 109.85 | 211.24 | 101.39 | 211.24 | |
| 000175 | | 2-External Drives | | | | | | | | | | | | |
| | 000 | 11/30/12 | 374.38 | P | SLMM | 03 00 | 0.00 | 374.38 | | 135.20 | 259.99 | 124.79 | 259.99 | |
| 000177 | | Up Grade Media Touch | | | | | | | | | | | | |
| | 000 | 11/30/12 | 7,773.86 | P | SLMM | 03 00 | 0.00 | 7,773.86 | | 2,807.23 | 5,398.52 | 2,591.29 | 5,398.52 | |
| 000178 | | Adobe Audition CS6 | | | | | | | | | | | | |
| | 000 | 11/30/12 | 623.45 | P | SLMM | 03 00 | 0.00 | 623.45 | | 225.15 | 432.97 | 207.82 | 432.97 | |
| 000179 | | 24" LED 720P HDT TV | | | | | | | | | | | | |
| | 000 | 12/30/12 | 171.19 | P | SLMM | 00 01 | 0.00 | 171.19 | | 171.19 | 171.19 | 0.00 | 171.19 | |
| 000180 | | 2 Avocent Longview Transmitter & Receiver CAT5 Extenders | | | | | | | | | | | | |
| | 000 | 11/26/12 | 1,638.24 | P | SLMM | 05 00 | 0.00 | 1,638.24 | | 354.95 | 682.60 | 327.65 | 682.60 | |
| 000181 | | Vorsis M1 MIC Processor | | | | | | | | | | | | |

# VilCom Interactive Media, LLC
### Depreciation Expense Report
### As of December 31, 2014

Book = Internal
FYE Month = December

| Sys No | Ext | In Svc Date | Acquired Value | P T | Depr Meth | Est Life | Salv/168 Allow Sec 179 | Depreciable Basis | Prior Thru | Prior Accum Depreciation | Depreciation This Run | Current YTD Depreciation | Current Accum Depreciation | Key Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 000 | 12/05/12 | 782.88 | P | SLMM | 05 00 | 0.00 | 782.88 | | 169.63 | 326.21 | 156.58 | 326.21 | |
| 000182 | Pre A/W Line Input Module | | | | | | | | | | | | | |
| | 000 | 05/21/13 | 1,229.60 | P | SLMM | 05 00 | 0.00 | 1,229.60 | | 143.45 | 389.37 | 245.92 | 389.37 | |
| 000183 | Dayton SCA Receiver; BTI The SS 4.1 MLR | | | | | | | | | | | | | |
| | 000 | 07/30/13 | 981.30 | P | SLMM | 05 00 | 0.00 | 981.30 | | 81.78 | 278.04 | 196.26 | 278.04 | |
| 000184 | Repainted Two 203' Towers | | | | | | | | | | | | | |
| | 000 | 08/12/13 | 4,000.00 | P | SLMM | 05 00 | 0.00 | 4,000.00 | | 333.33 | 1,133.33 | 800.00 | 1,133.33 | |
| 000186 | Intel Core i5-2430M 2.4GHz Laptop Computer | | | | | | | | | | | | | |
| | 000 | 06/25/13 | 369.00 | P | SLMM | 03 00 | 0.00 | 369.00 | | 61.50 | 184.50 | 123.00 | 184.50 | |
| 000187 | 2ghz Mac Mini Intel Core Computer | | | | | | | | | | | | | |
| | 000 | 07/17/13 | 244.99 | P | SLMM | 03 00 | 0.00 | 244.99 | | 34.03 | 115.69 | 81.66 | 115.69 | |
| 000188 | 4ch Analog In/Out | | | | | | | | | | | | | |
| | 000 | 11/30/12 | 4,123.50 | P | SLMM | 05 00 | 0.00 | 4,123.50 | | 893.44 | 1,718.14 | 824.70 | 1,718.14 | |
| 000190 | Sage ENDEC 3644 EAS | | | | | | | | | | | | | |
| | 000 | 09/20/11 | 2,027.29 | P | SLMM | 05 00 | 0.00 | 2,027.29 | | 912.30 | 1,317.76 | 405.46 | 1,317.76 | |
| 000191 | | | | | | | | | | | | | | |
| | 000 | 04/25/12 | 16.50 | P | SLMM | 05 00 | 0.00 | 16.50 | | 5.50 | 8.90 | 3.30 | 8.80 | |
| 000192 | Rolls Digital AM/FM Tuner | | | | | | | | | | | | | |
| | 000 | 04/25/12 | 217.39 | P | SLMM | 05 00 | 0.00 | 217.39 | | 72.47 | 115.95 | 43.48 | 115.95 | |
| 000193 | Tieline IP Only Duplex Codec w/AAC | | | | | | | | | | | | | |
| | 000 | 04/25/12 | 1,753.26 | P | SLMM | 05 00 | 0.00 | 1,753.26 | | 584.42 | 935.07 | 350.65 | 935.07 | |
| 000194 | Tieline IP Only Duplex Codec w/AAC | | | | | | | | | | | | | |
| | 000 | 04/25/12 | 1,753.26 | P | SLMM | 05 00 | 0.00 | 1,753.26 | | 584.42 | 935.07 | 350.65 | 935.07 | |
| 000195 | APHEX Stereo Compellor DIG/AN | | | | | | | | | | | | | |
| | 000 | 04/25/12 | 1,086.96 | P | SLMM | 05 00 | 0.00 | 1,086.96 | | 362.32 | 579.71 | 217.39 | 579.71 | |
| 000196 | 2-Broadcast Tools 1RU Rackmount Kits | | | | | | | | | | | | | |
| | 000 | 04/25/12 | 88.66 | P | SLMM | 05 00 | 0.00 | 88.66 | | 29.55 | 47.28 | 17.73 | 47.28 | |
| 000197 | Rolls Stereo 1x4 Distrbution AMP | | | | | | | | | | | | | |
| | 000 | 04/25/12 | 148.48 | P | SLMM | 05 00 | 0.00 | 148.48 | | 49.50 | 79.20 | 29.70 | 79.20 | |
| 000198 | Rolls Stereo 1x4 Distrbution AMP | | | | | | | | | | | | | |
| | 000 | 04/25/12 | 148.49 | P | SLMM | 05 00 | 0.00 | 148.49 | | 49.50 | 79.20 | 29.70 | 79.20 | |
| 000199 | 2-ERI RLA050-NF 7/8" Adapter/Reducer | | | | | | | | | | | | | |
| | 000 | 07/31/12 | 396.66 | P | SLMM | 05 00 | 0.00 | 396.66 | | 112.39 | 191.72 | 79.33 | 191.72 | |
| 000200 | Circuitwerkes Sicon 8 Web Based Remote | | | | | | | | | | | | | |
| | 000 | 07/31/12 | 988.00 | P | SLMM | 05 00 | 0.00 | 988.00 | | 279.93 | 477.53 | 197.60 | 477.53 | |
| 000201 | Staco USC-10005 UPS | | | | | | | | | | | | | |
| | 000 | 07/31/12 | 527.78 | P | SLMM | 05 00 | 0.00 | 527.78 | | 149.54 | 255.10 | 105.56 | 255.10 | |
| 000202 | 970-AVA5-50 7/8" Form Coax | | | | | | | | | | | | | |
| | 000 | 07/31/12 | 2,942.55 | P | SLMM | 05 00 | 0.00 | 2,942.55 | | 833.72 | 1,422.23 | 588.51 | 1,422.23 | |
| 000203 | 2-AL5E78-PS 7/8" EIA Connector | | | | | | | | | | | | | |
| | 000 | 07/31/12 | 222.30 | P | SLMM | 05 00 | 0.00 | 222.30 | | 62.99 | 107.45 | 44.46 | 107.45 | |
| 000204 | 5- 252130 Universal Angle Adapter(Box/10) | | | | | | | | | | | | | |
| | 000 | 07/31/12 | 177.30 | P | SLMM | 05 00 | 0.00 | 177.30 | | 50.24 | 85.70 | 35.46 | 85.70 | |
| 000205 | 15-252115 Universal Snap-in Hanger(Box/10) | | | | | | | | | | | | | |
| | 000 | 07/31/12 | 177.45 | P | SLMM | 05 00 | 0.00 | 177.45 | | 50.28 | 85.77 | 35.49 | 85.77 | |
| 000206 | 4-192565B Hoist Grip | | | | | | | | | | | | | |
| | 000 | 07/31/12 | 89.00 | P | SLMM | 05 00 | 0.00 | 89.00 | | 25.22 | 43.02 | 17.80 | 43.02 | |
| 000207 | 6-241088-2 Grounding Kit | | | | | | | | | | | | | |
| | 000 | 07/31/12 | 113.46 | P | SLMM | 05 00 | 0.00 | 113.46 | | 32.15 | 54.84 | 22.69 | 54.84 | |
| 000208 | 2-AL5NF-PSA TYPE NF | | | | | | | | | | | | | |
| | 000 | 07/31/12 | 46.64 | P | SLMM | 05 00 | 0.00 | 46.64 | | 13.22 | 22.55 | 9.33 | 22.55 | |
| 000209 | MYAT 201-0654 1-5/8" TO 7/8" Reducer Taper | | | | | | | | | | | | | |
| | 000 | 07/31/12 | 212.50 | P | SLMM | 05 00 | 0.00 | 212.50 | | 60.21 | 102.71 | 42.50 | 102.71 | |

# VilCom Interactive Media, LLC
## Depreciation Expense Report
### As of December 31, 2014

Book = Internal

FYE Month = December

| Sys No Ext | In Svc Date | Acquired Value | P T | Depr Meth | Est Life | Salv/168 Allow Sec 179 | Depreciable Basis | Prior Thru | Prior Accum Depreciation | Depreciation This Run | Current YTD Depreciation | Current Accum Depreciation | Key Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 000210 | 2-L4TNF-PSA 1/2" TYPE NF | | | | | | | | | | | | |
| 000 | 07/31/12 | 31.96 | P | SLMM | 05 00 | 0.00 | 31.96 | | 9.05 | 15.44 | 6.39 | 15.44 | |
| 000212 | 1-BIRD 50E ELEMENT | | | | | | | | | | | | |
| 000 | 06/19/12 | 71.39 | P | SLMM | 05 00 | 0.00 | 71.39 | | 21.43 | 35.71 | 14.28 | 35.71 | |
| 000213 | BIRD 500E ELEMENT | | | | | | | | | | | | |
| 000 | 06/19/12 | 71.39 | P | SLMM | 05 00 | 0.00 | 71.39 | | 21.43 | 35.71 | 14.28 | 35.71 | |
| 000214 | 2-BIRD 4240-002 7/8" QC CONNECTOR | | | | | | | | | | | | |
| 000 | 06/19/12 | 471.40 | P | SLMM | 05 00 | 0.00 | 471.40 | | 141.42 | 235.70 | 94.28 | 235.70 | |
| 000215 | Broadcast Tools SS8.1 III Switcher | | | | | | | | | | | | |
| 000 | 06/19/12 | 329.00 | P | SLMM | 05 00 | 0.00 | 329.00 | | 98.70 | 164.50 | 65.80 | 164.50 | |
| 000216 | Broadcast Tools RA1 Rack Adapter | | | | | | | | | | | | |
| 000 | 06/19/12 | 40.00 | P | SLMM | 05 00 | 0.00 | 40.00 | | 12.00 | 20.00 | 8.00 | 20.00 | |
| 000217 | Art Cleanbox PRO Interface | | | | | | | | | | | | |
| 000 | 06/19/12 | 36.55 | P | SLMM | 05 00 | 0.00 | 36.55 | | 10.98 | 18.29 | 7.31 | 18.29 | |
| 000218 | AUDEMAT FMB80 RDS ENCODER | | | | | | | | | | | | |
| 000 | 06/19/12 | 2,467.96 | P | SLMM | 05 00 | 0.00 | 2,467.96 | | 740.39 | 1,233.98 | 493.59 | 1,233.98 | |
| 000219 | 4-Aldena ALP0802712 Aluminium Antenna | | | | | | | | | | | | |
| 000 | 07/19/12 | 11,878.63 | P | SLMM | 05 00 | 0.00 | 11,878.63 | | 3,565.62 | 5,741.35 | 2,375.73 | 5,741.35 | |
| 000220 | 4-Aldena Hardware Structure-Fibreglass Poles | | | | | | | | | | | | |
| 000 | 07/19/12 | 2,213.12 | P | SLMM | 05 00 | 0.00 | 2,213.12 | | 627.05 | 1,069.67 | 442.62 | 1,069.67 | |
| 000221 | 4-Aldena XRALPFM Radome in ABS | | | | | | | | | | | | |
| 000 | 07/19/12 | 676.52 | P | SLMM | 05 00 | 0.00 | 676.52 | | 191.68 | 326.98 | 135.30 | 326.98 | |
| 000222 | Aldena XCE1 Antenna System Design Elaboration | | | | | | | | | | | | |
| 000 | 07/19/12 | 74.73 | P | SLMM | 05 00 | 0.00 | 74.73 | | 21.18 | 36.13 | 14.95 | 36.13 | |
| 000223 | Aldena DV5678B241Sx Broadband FM unbalanced Power Splitter | | | | | | | | | | | | |
| 000 | 07/19/12 | 2,922.44 | P | SLMM | 05 00 | 0.00 | 2,922.44 | | 828.03 | 1,412.52 | 584.49 | 1,412.52 | |
| 000224 | Aldena XDV Couple Bracket | | | | | | | | | | | | |
| 000 | 07/19/12 | 52.44 | P | SLMM | 05 00 | 0.00 | 52.44 | | 14.86 | 25.35 | 10.49 | 25.35 | |
| 000225 | 4-Aldena CV767878/3 Foam Cables | | | | | | | | | | | | |
| 000 | 07/19/12 | 1,254.72 | P | SLMM | 05 00 | 0.00 | 1,254.72 | | 355.50 | 606.44 | 250.94 | 606.44 | |
| 000226 | Aldena CV767878/4 Foam Cable | | | | | | | | | | | | |
| 000 | 07/19/12 | 445.77 | P | SLMM | 05 00 | 0.00 | 445.77 | | 126.31 | 215.46 | 89.15 | 215.46 | |
| 000227 | Aldena FSIMB Packing | | | | | | | | | | | | |
| 000 | 07/19/12 | 188.00 | P | SLMM | 05 00 | 0.00 | 188.00 | | 53.27 | 90.87 | 37.60 | 90.87 | |
| 000228 | 3-Aldena CV767878/3 Foam Cable | | | | | | | | | | | | |
| 000 | 07/19/12 | 1,254.72 | P | SLMM | 05 00 | 0.00 | 1,254.72 | | 355.50 | 606.44 | 250.94 | 606.44 | |
| 000229 | 300W FM Transmitter with Integral Digital Exciter | | | | | | | | | | | | |
| 000 | 06/22/12 | 4,342.40 | P | SLMM | 05 00 | 0.00 | 4,342.40 | | 1,302.72 | 2,171.20 | 868.48 | 2,171.20 | |
| 000230 | Orban 5500 Five Band and Two Band | | | | | | | | | | | | |
| 000 | 06/22/12 | 1,200.00 | P | SLMM | 05 00 | 0.00 | 1,200.00 | | 360.00 | 600.00 | 240.00 | 600.00 | |
| 000231 | VS300 Stepup-110V TO 220V Step Up Auto Transformer | | | | | | | | | | | | |
| 000 | 06/22/12 | 230.00 | P | SLMM | 05 00 | 0.00 | 230.00 | | 69.00 | 115.00 | 46.00 | 115.00 | |
| 000232 | Spare Power Amplifier Pallet | | | | | | | | | | | | |
| 000 | 06/22/12 | 350.00 | P | SLMM | 05 00 | 0.00 | 350.00 | | 105.00 | 175.00 | 70.00 | 175.00 | |
| 000233 | Spare Power Supply Module | | | | | | | | | | | | |
| 000 | 06/22/12 | 478.00 | P | SLMM | 05 00 | 0.00 | 478.00 | | 143.40 | 239.00 | 95.60 | 239.00 | |
| 000234 | Spare Fan | | | | | | | | | | | | |
| 000 | 06/22/12 | 30.00 | P | SLMM | 05 00 | 0.00 | 30.00 | | 9.00 | 15.00 | 6.00 | 15.00 | |
| 000235 | Spare Air Filter | | | | | | | | | | | | |
| 000 | 06/22/12 | 6.00 | P | SLMM | 05 00 | 0.00 | 6.00 | | 1.80 | 3.00 | 1.20 | 3.00 | |
| 000236 | Low Voltage Power Supply Kit | | | | | | | | | | | | |
| 000 | 06/22/12 | 120.00 | P | SLMM | 05 00 | 0.00 | 120.00 | | 36.00 | 60.00 | 24.00 | 60.00 | |
| 000237 | Labor on Installing Translator | | | | | | | | | | | | |

# VilCom Interactive Media, LLC

### Depreciation Expense Report
### As of December 31, 2014

Book = Internal

FYE Month = December

| Sys No | Ext | In Svc Date | Acquired Value | P T | Depr Meth | Est Life | Salv/168 Allow Sec 179 | Depreciable Basis | Prior Thru | Prior Accum Depreciation | Depreciation This Run | Current YTD Depreciation | Current Accum Depreciation | Key Code |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 000 | 08/25/12 | 14,241.71 | P | SLMM | 05 00 | 0.00 | 14,241.71 | | 3,797.79 | 6,646.13 | 2,848.34 | 6,646.13 | |
| 000238 | | Truss-Head Design Rack Screws | | | | | | | | | | | | |
| | 000 | 04/25/12 | 16.50 | P | SLMM | 05 00 | 0.00 | 16.50 | | 5.50 | 8.80 | 3.30 | 8.80 | |
| 000239 | | Peachtree Upgrade | | | | | | | | | | | | |
| | 000 | 12/31/13 | 1,030.93 | P | SLMM | 03 00 | 0.00 | 1,030.93 | | 0.00 | 343.64 | 343.64 | 343.64 | |
| 000240 | | Canan EOS Rebel T3i w/Vista Explorer Tripod | | | | | | | | | | | | |
| | 000 | 12/26/13 | 520.69 | P | SLMM | 03 00 | 0.00 | 520.69 | | 0.00 | 173.56 | 173.56 | 173.56 | |
| 000241 | | Relamping of Towers, 4 beacon blubs, 4 obstruction bulbs | | | | | | | | | | | | |
| | 000 | 03/17/14 | 1,200.00 | P | SLMM | 05 00 | 0.00 | 1,200.00 | | 0.00 | 180.00 | 180.00 | 180.00 | |
| 000242 | | DELL R320 SERVER | | | | | | | | | | | | |
| | 000 | 05/31/14 | 4,337.00 | P | SLMM | 03 00 | 0.00 | 4,337.00 | | 0.00 | 843.31 | 843.31 | 843.31 | |
| 000243 | | Dish Technologies | | | | | | | | | | | | |
| | 000 | 03/26/14 | 1,200.00 | P | SLMM | 05 00 | 0.00 | 1,200.00 | | 0.00 | 180.00 | 180.00 | 180.00 | |
| 000244 | | Broadcasters General Store | | | | | | | | | | | | |
| | 000 | 07/01/14 | 5,532.14 | P | SLMM | 05 00 | 0.00 | 5,532.14 | | 0.00 | 553.21 | 553.21 | 553.21 | |
| | | Grand Total | 607,586.44 | | | | 0.00 | 607,586.44 | | 525,229.97 | 542,570.35 | 28,931.13 | 554,161.10 | |
| | | Less disposals and transfers | 0.00 | | | | 0.00 | 0.00 | | 0.00 | | | 0.00 | |
| | | Count = 0 | | | | | | | | | | | | |
| | | Net Grand Total | 607,586.44 | | | | 0.00 | 607,586.44 | | 525,229.97 | 542,570.35 | 28,931.13 | 554,161.10 | |
| | | Count = 193 | | | | | | | | | | | | |

---------------------------------- Report Assumptions ----------------------------------

Report Name: Depreciation Expense
Source Report: <Standard Report>

Calculation Assumptions:
    Short Year: none
    Include Sec 168 Allowance & Sec 179: No
    Adjustment Convention: None

Key Codes:
    a:    A depreciation adjustment amount is included in the reporting period.
    b:    The asset's business-use percentage is less than 100%.
    d:    The asset has been disposed.
    f:    The asset was switched from a MACRS table calculation to the MACRS formula calculation.
    l:    The asset's depreciation has been limited by luxury auto rules.
    m:    The asset's depreciation was calculated using the mid-quarter convention.
    r:    The asset's acquired value was reduced to arrive at the depreciable basis.
    s:    The asset was switched from declining-balance to a straight-line.
    t:    The asset was transferred.
    v:    The asset has switched to remaining value over remaining life due to ACE.

Group/Sorting Criteria:
    Group = All Complete Assets
    Include Assets that meet the following conditions:
        All Complete Assets
    Sorted by: System No, Extension

ASSET PURCHASE AGREEMENT

Schedule 1.2

List of Prepetition and/or Post-petition Trade Payables

| Creditor | Estimated |
|---|---|
| **Unsecured Non-insider** | |
| ADP, Inc. | $181.53 |
| AT&T | $197.31 |
| AT&T Pro-Cabs | $114.31 |
| Bank of America Visa | $1,279.44 |
| BB&T Processing | $140.62 |
| Binghamton University | $0.00 |
| Brooks Pierce McLendon Humphrey | $265.00 |
| Chapel Hill Chamber | $3,000.00 |
| De Lage Landen | $537.52 |
| Fiber Hosting | $189.00 |
| Grant Thornton, LLP | $4,282.50 |
| Internal Revenue Service | $9,360.00 |
| Jeff Beck, LLC | $318.00 |
| James W. Davis Consulting | $1,206.00 |
| Marketron Broadcasting | $234.20 |
| Partnership for a Sustainable Community | $500.00 |
| Piedmont Mowing | $410.00 |
| ProBenefits | $49.50 |
| Radio Advertising | $78.00 |
| Second Street Media | $175.00 |
| Splinter Group | $237.50 |
| Sue Pace | $200.00 |
| Verizon Wireless | $172.49 |
| Westwood One, Inc. | $150.00 |
| Windstream Communications | $271.64 |
| Windstream Communications | $329.62 |
| Vilcom McClamroch Property, LLC | $8,342.00 |
| Vilcom Properties, LLC | $2,050.00 |
| **Subtotal** | **$34,271.18** |

ASSET PURCHASE AGREEMENT
Schedule 2.5

List of Intellectual Property Assets (Page 1 of 2)

All Assets as listed in Section 1.1, including but not limited to the following:

1. CHAPELBORO:  USPTO Registration No. 4107915; Serial No. 85310601
2. WCHL

URLS:

| URL Listing | Expire Date |
| --- | --- |
| 979WCHL.COM | 5/16/2014 |
| ARELOCALDEAL.COM | 3/15/2014 |
| BESTOFCHAPELBORO.COM | 9/26/2014 |
| CARRBOROCOUPONS.COM | 1/24/2014 |
| CARRBOROLOCAL.COM | 1/22/2014 |
| CARRBOROPOLITICS.COM | 5/27/2014 |
| CARRBOROTODAY.COM | 3/7/2014 |
| CHAPALBORO.COM | 1/13/2014 |
| CHAPELBARO.COM | 1/13/2014 |
| CHAPELBORO.COM | 8/11/2016 |
| CHAPELBORO.INFO | 6/5/2014 |
| CHAPELBORO.NET | 6/5/2014 |
| CHAPELBORO.ORG | 6/5/2014 |
| CHAPELBORO.TV | 4/1/2014 |
| CHAPELBOROEATS.COM | 1/12/2014 |
| CHAPELBOROENTERPRISES.COM | 5/16/2014 |
| CHAPELBOROFOOD.COM | 1/12/2014 |
| CHAPELBOROMEDIA.COM | 6/6/2014 |
| CHAPELBOROOPENHOUSES.COM | 5/7/2014 |
| CHAPELBOROPOST.COM | 12/18/2013 |
| CHAPELBORORELO.COM | 7/2/2014 |
| CHAPELBORORELOCATIONGUIDE.COM | 7/2/2014 |
| CHAPELBOROTODAY.COM | 9/23/2014 |
| CHAPELBOROTV.COM | 4/1/2014 |
| CHAPELBOROUGH.COM | 12/17/2013 |
| CHAPELBOROVISITOR.COM | 7/2/2014 |
| CHAPELBOROVISITORS.COM | 7/2/2014 |
| CHAPELBOROYARDSALES.COM | 5/7/2014 |
| CHAPELHILLBORO.COM | 12/20/2013 |
| CHAPELHILLCARRBORO.NET | 9/19/2014 |
| CHAPELHILLPOLITICS.COM | 5/27/2014 |

ASSET PURCHASE AGREEMENT
Schedule 2.5

List of Intellectual Property Assets (Page 2 of 2)

| | |
|---|---|
| CHAPELHILLSOCIAL.COM | 9/21/2015 |
| CHAPELHILLYARDSALE.COM | 5/7/2014 |
| CHAPELLBORO.COM | 12/17/2013 |
| CHCUNC.COM | 3/14/2014 |
| CHL365.COM | 8/22/2014 |
| CHSOCIAL.COM | 9/21/2014 |
| COMMUNITYHOTLINKS.COM | 5/9/2014 |
| COMMUNITYHOTLINKS.INFO | 5/9/2014 |
| DIGTHETRIANGLE.COM | 5/27/2014 |
| FMWCHL.COM | 5/16/2014 |
| GETGREENNC.COM | 5/27/2014 |
| GOCHAPELHILLCARRBORO.COM | 7/18/2014 |
| KNOWCHAPELBORO.COM | 7/9/2014 |
| LOCALDEAL4YOU.COM | 2/20/2014 |
| LOCALDEALFORYOU.COM | 2/20/2014 |
| MARRYMERONSTUTTS.COM | 12/15/2013 |
| MYCHCB.COM | 1/22/2014 |
| OFFERITLOCAL.COM | 2/20/2014 |
| OURLOCALDEAL.COM | 3/7/2014 |
| OURLOCALSALE.COM | 1/13/2014 |
| RLOCALDEAL.COM | 3/15/2014 |
| TASTEOFCARRBORO.COM | 12/17/2013 |
| TASTEOFCH.COM | 12/17/2013 |
| TASTEOFCHAPELBORO.COM | 12/17/2013 |
| TOPOFTHEHILLCUP.COM | 10/10/2014 |
| WCHL.COM | 11/15/2013 |
| WCHL.ORG | 6/6/2014 |
| WCHL.TV | 8/22/2014 |
| WCHL1360.COM | 10/17/2014 |
| WCHL979FM.COM | 5/16/2014 |
| WCHLFM.COM | 5/16/2014 |
| WCHLHEALTHIESTYOU.COM | 3/4/2014 |
| WCHLLUCKYLINKS.COM | 7/4/2014 |
| WCHLRADIO.COM | 6/6/2014 |
| YOURVOICEOURSTORY.COM | 1/22/2014 |
| YOURVOICEOURTOWN.COM | 2/28/2014 |
| YOURVOICEOURTOWN.NET | 2/28/2014 |
| YOURVOICEOURTOWN.ORG | 2/28/2014 |
| YOURVOICEOURTOWNS.COM | 2/28/2014 |

ASSET PURCHASE AGREEMENT

Schedule 2.6

List of Licenses

1.  AM Broadcast Station License; File No. BZ-880512AL; Call Sign: WCHL; Licensee: Village Broadcasting Company, Inc.

2.  FM Broadcast Translator/Booster Station License; License File No. BLFT-20120815ABB; Call Sign: W250BP; Facility ID: 147280; Licensee: VilCom Interactive Media, LLC.

3.  KB96775, Broadcast Auxiliary Remote Pickup, Expiring December 1, 2019

4.  KF4221, Broadcast Auxiliary Remote Pickup, Expiring December 1, 2019

5.  KIQ412, Broadcast Auxiliary Remote Pickup, Expiring December 1, 2019

6.  WPWK404, Aural Studio Transmitter Link, Expiring December 1, 2019

7.  WQQU778, Aural Studio Transmitter Link, Expiring December 1, 2019

8.  Antenna Structure Registration 1048275 (TWR 1)

9.  Antenna Structure Registration 1048276 (TWR 2)

ASSET PURCHASE AGREEMENT

Schedule 2.7

Exceptions to Claims and Legal Actions

[None]

ASSET PURCHASE AGREEMENT

Schedule 4.18(b) – Part 1

List of Assigned Contracts (Page 1 of 2)

1. CBS News Affiliation Agreement dated May 11, 2015 between Westwood One, Inc., ("WWO") and Seller ("Broadcaster")/CBS

2. Tar Heel Sports Network Agreement between Learfield Communications, Inc. and Seller, as broadcaster, dated September 17, 2009

3. AP Online Video Network Agreement between The Associated Press and Seller dated December 1, 2008

4. All advertising contracts, including but not limited to the list of contracts attached hereto as Schedule 4.18(b) – Part 2

5. AM Broadcast Station License; File No. BZ-880512AL; Call Sign: WCHL; Licensee: Village Broadcasting Company, Inc.

6. FM Broadcast Translator/Booster Station License; License File No. BLFT-20120815ABB; Call Sign: W250BP; Facility ID: 147280; Licensee: VilCom Interactive Media, LLC

7. License Agreement between SpectraSite Communications, LLC, as licensor, and Seller, as licensee, dated _____, 2012, as modified by (i) Assignment of License Agreement between Seller, as assignor, and VilCom Properties, LLC, as assignee, effective as of August 1, 2012; and (ii) Sub-License Agreement between Seller, as sub-licensee, and VilCom Properties, LLC, as sub-licensor, dated August 1, 2012, regarding the FM tower and its facilities located on Jones Ferry Road, Chapel Hill, NC

8. Lease Agreement between Seller, as tenant, and Vilcom McClamroch Property, LLC (successor in interest to VilCom Properties, LLC), as landlord, dated August 1, 2000, as modified by (i) Amendment between Seller, as tenant, and VilCom Properties, LLC dated October 6, 2006; (ii) Lease Addendum Agreement between Seller, as tenant, and VilCom Properties, LLC, as landlord, dated September 1, 2009; and (iii) Third Lease Amendment between Seller, as tenant, and VilCom Properties, LLC, as landlord, dated December 31, 2011, regarding office space located at 88 Vilcom Circle.

9. Lease Agreement between Jeff Beck, LLC (successor in interest to Bet Pou McClamroch), as landlord, and Village Broadcasting Company, Incorporated, as lessee, dated May 1, 1996, as modified by (i) Assignment, Assumption and Consent Agreement, between Village Broadcasting Company, Inc., as assignor, WCHL, Inc., as assignee, and Bet Pou McClamroch, as landlord, dated October 16, 1997, (ii) Addendum to Lease between Bet Pou McClamroch and WCHL-WDNC, Inc. dated August 30, 2002; and (iii) Assignment, Assumption and Consent Agreement between WCHL-WDNC, Inc., as assignor, Seller, as assignee, and Bet Pou McClamroch, as landlord, dated August 15, 2004

ASSET PURCHASE AGREEMENT

Schedule 4.18(b) – Part 1

List of Assigned Contracts (Page 2 of 2)

10. Agreement between WCHL and Dial Global dated January 28, 2010, as may be amended, regarding broadcasting of <u>The Best of Bill Press</u>

11. Agreement between WCHL and Dial Global dated January 28, 2010, as may be amended, regarding broadcasting of <u>The Best of Thom Hartmann</u>

12. Addendum for WCHL-AM 1360 Ed Schultz Contract dated January 25, 2010 between Seller and Dial Global

13. Addendum for WCHL-AM 1360 Stephanie Miller Show Contract dated January 25, 2010 between Seller and Dial Global

14. Addendum for WCHL-AM 1360 Ed Schultz, Stephanie Miller, Best of Stephanie Miller and Best of Thom Hartmann Show Contracts dated March 25, 2010 between Seller and Dial Global

15. Agreement between Seller and SESAC

16. Service Agreement between Seller and Time Warner Cable, Inc. dated February 24, 2012 for feed to AM transmitter site

17. Service Agreement between Seller and Time Warner Cable Inc. dated March 7, 2012 for internet to office/studio

18. Software License and Service Agreement between Seller and Marketron Broadcast Solutions, LLC dated January 1, 2013

19. Agreement between WCHL-AM and Broadcast Music, Inc. ("BMI")

20. 2004 Radio Station License Agreement between Seller and American Society of Composers, Authors and Publishers ("ASCAP")

21. Life Insurance Policy #82 263 807 dated October 27, 2009 with John Hancock, as Carrier, payable upon the death of James A. Heavner, as insured, in the amount of $1,000,000.00, with Seller as the Owner and Beneficiary.

ASSET PURCHASE AGREEMENT

Schedule 4.18(b) – Part 2

List of Advertising Contracts (Page 1 of 1)

| Advertiser/Company | 97.9 WCHL or Chapelboro.com | Start Date | End Date |
|---|---|---|---|
| Durham Technical Community College | 97.9 WCHL | July 1, 2014 | June 30, 2015 |
| Dickey's Barbecue Pit | 97.9 WCHL | March 9, 2015 thru April 9, 2015; resume July 1, 2015 | December 31, 2015 |
| Crown Honda of Southpoint | 97.9 WCHL | February 1, 2015 | December 31, 2015 |
| Coleman Huntoon and Brown | 97.9 WCHL | August 1, 2014 | July 31, 2015 |
| Chapel Hill Downtown Partnership | 97.9 WCHL | May 1, 2015 | August 31, 2015 |
| The Carolina Inn | 97.9 WCHL | July 1, 2014 | June 30, 2015 |
| Broadcasting Experts | 97.9 WCHL | May 5, 2015 | May 4, 2016 |
| Breadman's | 97.9 WCHL | August 1, 2014 | July 31, 2015 |
| Bank of NC | 97.9 WCHL | August 1, 2014 | July 31, 2015 |
| AT7T Wireless | 97.9 WCHL | August 1, 2014 | July 31, 2015 |
| Franklin Street Realty | 97.9 WCHL | September 1, 2014 | August 31, 2015 |
| Fitch Lumber and Hardware | 97.9 WCHL | September 1, 2014 | August 31, 2015 |
| Elite Auto Body | 97.9 WCHL | May 1, 2015 | April 30, 2016 |
| Egg & I Restaurant | 97.9 WCHL | February 23, 2015 | February 28, 2016 |
| Landscape Logic | 97.9 WCHL | March 1, 2015 | February 28, 2017 |
| Kidzu Children's Museum | 97.9 WCHL | April 10, 2015 | Ma 31, 2015 |
| Kennedy Dental Group | 97.9 WCHL | March 1, 2015 | June 30, 2015 |
| Holmes Oil (Cruizers) | 97.9 WCHL | September 1, 2014 | August 31, 2015 |
| High and Rubish Insurance | 97.9 WCHL | May 1, 2015 | December 31, 2015 |
| Grimball Jewelers | 97.9 WCHL | August 1, 2015 | July 31, 2016 |
| Great Outdoor Provision Company | 97.9 WCHL | April 1, 2015 | September 30, 2015 |
| Glasshalfull | 97.9 WCHL | January 1, 2015 | December 31, 2015 |
| Seagroves nationwide Insurance | 97.9 WCHL | May 1, 2015 | August 31, 2015 |
| PTA Thrift Shop | 97.9 WCHL | July 1, 2014 | June 30, 2015 |
| Performance Automotive | 97.9 WCHL | January 1, 2015 | December 31, 2017 |
| Orange County Government | 97.9 WCHL | August 1, 2014 | July 31, 2015 |
| Mark Vitali Agency AAI | 97.9 WCHL | May 1, 2015 | August 31, 2015 |
| Wings Over Chapel Hill | 97.9 WCHL | January 1, 2015 | December 31, 2015 |
| The Vapor Girl | 97.9 WCHL | Jay 1, 2015 | August 31, 2015 |
| MarketSmart Advertising (for UNC Health Care) | 97.9 WCHL | July 1, 2014 | June 30, 2015 |
| MarketSmart Advertising (for UNC Family Medicine) | 97.9 WCHL | July 1, 2014 | June 30, 2015 |
| Town Hall Grill | 97.9 WCHL | January 12, 2015 | December 31, 2015 |
| Townsend Bertram & Company | 97.9 WCHL | May 29, 2015 | July 31, 2915 |
| Woof Gang Bakery & Grooming @ Chapel Hill | 97.9 WCHL | August 1, 2014 | July 31, 2015 |
| Woods Charter School | 97.9 WCHL | May 25, 2015 | June 25, 2015 |
| The Cedars | 97.9 WCHL | March 1, 2015 | February 28, 2016 |
| Bryan Properties Inc (Southern Village) Market Street Association | 97.9 WCHL | April 6, 2015 | September 30, 2015 |
| Southern Season | 97.9 WCHL | January 1, 2015 | December 31, 2015 |
| Tony Hall & Associates | 97.9 WCHL | July 1, 2014 | June 30, 2015 |
| The Trolly Stop Chapel Hill | 97.9 WCHL | June 15, 2015 | July 31, 2015 |
| Performance Auto Mall | Chapelboro.com | January 2015 | December 2017 |

ASSET PURCHASE AGREEMENT

Schedule 4.19

List of Employees

Jan Bolick – Sales
Art Chansky- Sales and Programming
Jess Clark - Reporter
Rachel Cook- Web Manager
Kerrin Cox- Operations Manager
Kenny Dike- Sales
Elizabeth Friend- Assistant News Director
Jim Heavner – CEO and Program Director
Carter Herling- News Intern
Blake Hodge- News Director
Danny Hooley- Reporter
Aaron Keck- Announcer and Copy Writer
Nicki Morse- Program Manager
Joseph Robinson – Production Editor
Dawud Salim- Production Editor
Hillary Seckman- Client Services
Ron Stutts- Announcer
Avery Trendel- Sports Intern